# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JAMES DOUGLAS DICKSON, | ) | |
| NIKOLE ANN DICKSON, | ) | |
| | ) | Case No. 19-70934-SCS |
| *Debtors*. | ) | |
| | ) | |
| JAMES RIVER PETROLEUM, INC., | ) | |
| | ) | APN 19-07013-SCS |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NIKOLE ANN DICKSON, | ) | |
| | ) | Chapter 7 |
| *Defendant*. | ) | |

## MEMORANDUM OPINION

This matter came on for trial on January 28, 2020, upon the Complaint Pursuant to 11 U.S.C. § 523 Objecting to the Dischargeability of the Debt to James River Petroleum, Inc. and for Entry of Judgment filed by James River Petroleum, Inc. ("James River"). At the conclusion of the trial, the Court took this matter under advisement. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the evidence, arguments presented by counsel at the trial, and pleadings submitted, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## I. PROCEDURAL HISTORY

Nikole Ann Dickson ("Mrs. Dickson") and James Douglas Dickson ("Mr. Dickson," and collectively, with Mrs. Dickson, the "Debtors") filed, by counsel, a petition under Chapter 7 of the

United States Bankruptcy Code on March 14, 2019. On their schedules, the Debtors listed

$186,289.55 in total unsecured nonpriority debt with the amount owed to James River set forth as

"unknown." *See* Schedule E/F, Case No. 19-70934-SCS, ECF No. 1, at 35, 42. The § 341 Meeting

of Creditors was held and concluded on April 23, 2019. The Debtors received their Chapter 7

discharge on July 1, 2019. Seven days prior, on June 24, 2019, James River filed a Complaint

Pursuant to 11 U.S.C. § 523 Objecting to the Dischargeability of the Debt to James River

Petroleum, Inc. and for Entry of Judgment, which commenced the above-captioned Adversary

Proceeding. Complaint Pursuant to 11 U.S.C. § 523 Objecting to the Dischargeability of the Debt

to James River Petroleum, Inc. and for Entry of Judgment, Adv. Proc. No. 19-07013-SCS, ECF

No. 1 (hereinafter, "Complaint").

In the Complaint, James River requests the Court to determine the dischargeability of the

debt owed by Mrs. Dickson pursuant to a lease agreement and consignment contract entered into

between James River and Dickson Convenience Store LLC (hereinafter, "Dickson Convenience")

on September 21, 2017, and a guaranty agreement entered into between Mrs. Dickson, Dickson

Convenience, and James River on the same day. *See id.* at preamble, paras. 9-10, 12. Under the

lease agreement, James River leased a convenience store located in Elizabeth City, North Carolina,

to Dickson Convenience. *Id.* at para. 9; *see also id.* Ex. A, Lease Agreement between James River

Petroleum, Inc., and Dickson Convenience Store LLC, dated September 21, 2017 (hereinafter,

"Lease Agreement"), at preamble.[1] As a condition precedent to the Lease Agreement, James River

required Dickson Convenience to enter into a consignment contract for James River's delivery of

petroleum products to Dickson Convenience. *Id.* at paras. 9-10; *see also id.* Ex. B, Consignment

---

[1] The Lease Agreement was tendered among James River's trial exhibits as Exhibit 1. *See* Pl. Ex.
1.

Contract between James River Petroleum, Inc., and Dickson Convenience Store LLC, dated

September 21, 2017 (hereinafter, "Consignment Contract"), at para. B(1).[2] When Dickson

Convenience sold the petroleum products, the proceeds were to be paid to James River. *Id*. at paras.

11, 13. James River alleges that the proceeds from the cash sales of consigned petroleum products

constituted its property. *Id.* at paras. 1, 11, 13. However, Mrs. Dickson and Dickson Convenience

purportedly failed to comply with the Consignment Contract by failing to turn over all daily cash

proceeds to James River. *Id.* at paras. 1, 13. Mrs. Dickson individually guaranteed all payments

and obligations under the Lease Agreement and Consignment Contract. *See id.* at para. 12; *see

also* Consignment Contract Ex. B (Guaranty Agreement between Nikole Dickson and James River

Petroleum, Inc., dated September 21, 2017) (hereinafter, "Guaranty Agreement").[3] James River

seeks to have the Court declare the amounts guaranteed by Mrs. Dickson to be nondischargeable

pursuant to 11 U.S.C. §§ 523(a)(4) and 523(a)(6) and further requests entry of judgment against

Mrs. Dickson for breach of fiduciary duty and conversion. Complaint, at preamble, paras. 12, 18,

25, 35, 41.

According to James River, Mrs. Dickson and Dickson Convenience had a fiduciary duty

to turn over all proceeds from the sale of petroleum products each day under the Guaranty

Agreement and the Consignment Contract, respectively. *Id.* at para. 15. James River asserts Mrs.

Dickson intentionally caused Dickson Convenience to fail to turn over $171,575.11 of funds held

in trust for the benefit of James River and was personally responsible for Dickson Convenience's

conduct. *Id.* at paras. 16-17. James River argues Mrs. Dickson's actions constituted a breach of

her fiduciary duties to Dickson Convenience. *Id.* at para. 18. James River further alleges that

---

[2] The Consignment Contract was included among James River's trial exhibits as Exhibit 2. *See* Pl. Ex. 2.

[3] The Guaranty Agreement was Exhibit 3 among James River's trial exhibits. *See* Pl. Ex. 3.

Dickson Convenience and Mrs. Dickson are additionally liable for late fees equal to 10 percent of the funds not turned over to James River pursuant to the Consignment Contract and the Guaranty Agreement, for total late fees of $17,157.51. *Id.* at para. 19; *see also* Consignment Contract, at para. C(5)(a). Additionally, James River alleges that Mrs. Dickson agreed to indemnify and hold James River harmless for any loss or damages, including attorney's fees, arising out of Dickson Convenience's failure to comply with the Consignment Contract. Complaint, at para. 20; *see also* Consignment Contract, at para. E(12); Guaranty Agreement, at para. 1.

Next, James River asserts that Mrs. Dickson's failure to turn over the $171,575.11 in proceeds from the sale of petroleum products constituted conversion because she fraudulently appropriated funds belonging to James River for her own benefit or the benefit of Dickson Convenience. *See* Complaint, at paras. 22-23. James River argues that Mrs. Dickson deprived James River of possession of the proceeds and that she wrongfully exerted dominion over that sum, which was inconsistent with James River's rights to the funds. *Id.* at paras. 24-25. James River contends that Mrs. Dickson knew that the $171,575.11 constituted its property and that she intended to permanently deprive James River of those funds. *Id.* at paras. 26-27.

Third, James River alleges that Mrs. Dickson's outstanding debt to James River, including the $171,575.11 in funds not turned over to it, the related late fees, and James River's attorney's fees and costs, are nondischargeable because they arose from Mrs. Dickson's and Dickson Convenience's fraud and defalcation. *Id.* at para. 30. James River argues that Mrs. Dickson and Dickson Convenience owed fiduciary duties to it with respect to the funds, which it asserts were to be held in express trust for James River's benefit, that Mrs. Dickson was personally responsible for Dickson Convenience's conduct, and Mrs. Dickson caused Dickson Convenience to fail to turn over the funds that were to be held in trust. *Id.* at paras. 29, 32. James River contends Mrs. Dickson

4

fraudulently appropriated the funds for her own benefit or for the benefit of Dickson Convenience. *Id.* at paras. 31, 34. James River alleges that Mrs. Dickson's conduct "constitutes fraud and defalcation while acting in a fiduciary capacity, embezzlement and larceny" pursuant to 11 U.S.C. § 523(a)(4). *Id.* at para. 35.

Finally, James River alleges that Mrs. Dickson caused injury to James River by converting the latter's funds without just cause or excuse. *Id.* at paras. 37, 40. James River asserts that Mrs. Dickson intended to wrongfully deprive James River of its funds, acting with substantial certainty that her actions would cause harm to James River. *Id.* at paras. 38-39. James River contends that Mrs. Dickson maliciously converted James River's funds, demonstrating a subjective motive to cause harm to James River. *Id.* at paras. 37, 39. James River alleges that Mrs. Dickson's actions constitute willful and malicious injury within the meaning of 11 U.S.C. § 523(a)(6), making the resulting damages nondischargeable. *Id.* at para. 41. The Complaint asserts that the total nondischargeable debt pursuant to 11 U.S.C. §§ 523(a)(4) and 523(a)(6) is not less than $171,575.11, plus late fees of $17,157.51, attorney's fees and costs, and pre- and post-judgment interest at the federal judgment rate. *Id.* at prayer.

Mrs. Dickson, by counsel, filed an answer to the Complaint on July 26, 2019, admitting that she entered into the Lease Agreement and Consignment Contract. *See* Answer to Complaint, Adv. Proc. No. 19-07013-SCS, ECF No. 5 (hereinafter, "Answer"), at paras. 9-10. Mrs. Dickson admits that the Consignment Contract "contains a guaranty" but does not waive any defenses with respect to the Guaranty Agreement and neither admits nor denies that she entered into such agreement. *Id.* at para. 12. Mrs. Dickson denies that James River, under the terms of the Consignment Contract, could access and track all of Dickson Convenience's sales through James River's point of sale system and demands strict proof of accounting. *Id.* at para. 13.

Mrs. Dickson admits that James River owned the proceeds from the sale of the petroleum products. *Id.* at para. 1. However, Mrs. Dickson denies that she and Dickson Convenience intentionally failed to comply with the Consignment Contract by failing to turn over all daily proceeds from the cash sale of petroleum products. *Id.* at paras. 1, 11, 13, 16. Mrs. Dickson rejects James River's assertion that she and Dickson Convenience owed any fiduciary such duties to James River to turn over all proceeds from the sale of petroleum products. *Id.* at para. 15. Mrs. Dickson denies that she intentionally caused Dickson Convenience to fail to turn over the funds and that she was personally responsible for Dickson Convenience's conduct. *Id.* at paras. 16-17. Mrs. Dickson further denies that she breached her fiduciary duty to Dickson Convenience by causing Dickson Convenience to fail to turn over funds held for James River in trust. *Id.* at paras. 1, 18. Regarding conversion, Mrs. Dickson denies that she converted $171,575.11 of James River's funds for her or Dickson Convenience's benefit. *Id.* at paras. 1, 23-25, 27. Finally, Mrs. Dickson denies that her actions constitute fraud and defalcation pursuant to 11 U.S.C. § 523(a)(4) so as to render the debt to James River to be nondischargeable. *See id.* at paras. 1, 29-35. Mrs. Dickson also denies that her actions caused willful and malicious injury to James River and that the debt owed to James River is nondischargeable pursuant to 11 U.S.C. § 523(a)(6). *See id.* at paras. 1, 37-41.

Prior to trial, on January 24, 2020, the parties filed a Partial Stipulation of Facts, which largely restated facts alleged in the Complaint and Answer. Partial Stipulation of Facts, Adv. Proc. No. 19-07013-SCS, ECF No. 16 (hereinafter, "Partial Stipulation"). Although not addressed by Mrs. Dickson in her Answer, the parties stipulated that Mrs. Dickson entered into the Guaranty Agreement with James River on September 21, 2017, guaranteeing payment and performance of

all of Dickson Convenience's obligations under the Consignment Contract and Lease Agreement. *Id.* at para. 8.

Additionally, on January 21, 2020, James River, by counsel, filed Objections to Defendant's Designated Exhibits, objecting to Mrs. Dickson's Exhibit T on two grounds. Plaintiff's Objections to Defendant's Designated Exhibits, Adv. Proc. No. 19-07013-SCS, ECF No. 14 (hereinafter, "James River's Objection to Exhibit"). Exhibit T contained documents depicting "'e-mails with pictures of the Convenience Store.'" *Id.* at para. 2. First, James River asserts that the items included in Exhibit T were not produced in response to discovery requests. *Id.* Second, Mrs. Dickson did not provide "initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) identifying any relevant documents." *Id.* At the commencement of trial, counsel for Mrs. Dickson agreed that Exhibit T was not provided during discovery and accordingly withdrew the exhibit. *See* Transcript of January 28, 2020 Trial (hereinafter, "Tr."), at 2. The Court accepted the parties' resolution of James River's Objection to Exhibit and therefore sustained the objection. *Id.* Counsel for James River also objected to Mrs. Dickson calling Mr. Dickson as a witness because he was not included in the pre-trial disclosures. *Id.* at 3. However, counsel for the parties represented that Mrs. Dickson agreed that Mr. Dickson would not be called as a witness. *Id.* The Court accepted the parties' resolution. *Id.* Additionally, at the close of opening statements by counsel for the parties, the Court accepted the Partial Stipulation and deemed the exhibits filed by James River and the exhibits filed by Mrs. Dickson (with the exception of the withdrawn exhibit) as admitted. *Id.* at 8-9.

## II.  FINDINGS OF FACT

The factual history is uncontested. James River is a supplier of petroleum fuel products. *See* Pl. Ex. 2, Consignment Contract between James River Petroleum, Inc., and Dickson

Convenience Store LLC, dated September 21, 2017 (hereinafter, "Consignment Contract"),[4] at preamble; *see also* Tr. at 18. James River leased a convenience store in Elizabeth City, North Carolina, from GPACK Hughes Blvd LLC pursuant to a prime lease dated November 17, 2006. Pl. Ex. 1, Lease Agreement between James River Petroleum, Inc., and Dickson Convenience Store LLC, dated September 21, 2017 (hereinafter, "Lease Agreement"),[5] at § 22.13. James River subleased the convenience store, along with the equipment and fixtures on the property (the "Gas Station"), to independent store operators, which leases included the contractual obligation to sell James River's petroleum products on consignment. *See* Partial Stipulation, at para. 6; Lease Agreement, at preamble, § 4.3(b); Consignment Contract, at preamble, para. B(1); *see also* Tr. at 11-12, 14, 16-18, 99 (discussing the operators of the Gas Station from 2017 to present); Pl. Ex. 39, Dec. 16, 2019 Deposition of Nikole A. Dickson (hereinafter, "Dep."), at 10-11, 13, 20-22.

Mrs. Dickson's educational background includes completion of high school and "a couple of semesters worth" of college classes. Tr. at 60; Dep. at 8. Mrs. Dickson's college coursework included a "couple of business" classes and "a couple of HR classes." Tr. at 60. Afterward, Mrs. Dickson worked in restaurants, including at one point managing a fast food restaurant, before transitioning to the convenience store industry. *See id.* at 10; *see also* Dep. at 8. Mrs. Dickson's convenience store employment began in 2010; she worked for Wawa, Pilot Travel Center, and White's Travel Center over approximately five and a half years. Tr. at 10; *see also* Dep. at 8-9. All three of the convenience stores sold fuel products. Tr. at 11. Mrs. Dickson then worked for a truck

---

[4] The Consignment Contract was attached to the Complaint as Exhibit B. *See* Complaint, Ex. B.
[5] The Lease Agreement was attached to the Complaint as Exhibit A. *See* Complaint, Ex. A.

center for a few months and subsequently as a sales representative for a wholesaler of candy, cigarettes, and other convenience store items for another few months. *Id.*; Dep. at 8-10.[6]

In April 2017, Mrs. Dickson was hired by Mr. Rambir,[7] the previous operator of the Gas Station, as the sole manager of the store. Tr. at 11-13; *see also* Dep. at 10-11, 13. Mrs. Dickson handled the store's day-to-day operations, including hiring and overseeing employees, placing orders, and making daily cash deposits into a bank account designated by Mr. Rambir. Tr. at 12-13; Dep. at 11. Mr. Rambir "only stopped by for visits." Tr. at 12. Mrs. Dickson worked five days a week, approximately ten hours each day, for a bi-weekly salary of $1,500.00. Dep. at 17-18. Mrs. Dickson testified that the Gas Station sold James River's fuel. Tr. at 13. While she was managing the Gas Station, she received letters from James River stating that Mr. Rambir failed to pay rent to James River. Dep. at 18. In August 2017, James River ended Mr. Rambir's store operations at the Gas Station and eventually sued him. *Id.* at 13, 18-20; *see also id.* at 14.

Mrs. Dickson worked for another company for a couple of weeks before being asked by James River in September 2017 to become the new operator of the Gas Station. *Id*. at 10, 14-16; *see* Tr. at 61-62. A vice-president at James River initially approached Mrs. Dickson about her interest in operating the Gas Station while she was working for Mr. Rambir. Tr. at 61; Dep. at 14-15. Initially, Mrs. Dickson did not pursue the offer because she was unsure if doing so was financially feasible given the Gas Station's startup costs, including licenses for the business and alcohol sales, as well as expenses to restock inventory.[8] Tr. at 62; *see* Dep. at 15-16, 81. When

---

[6] Mrs. Dickson also obtained her real estate license in 2018 and worked for Uber and Door Dash between October 2018 and March 2019. Dep. at 11-13.

[7] Neither Mrs. Dickson, by her testimony, nor any of the admitted exhibits provide Mr. Rambir's first name.

[8] During the few weeks the Gas Station was shut down, some inventory expired; items such as beer had to be discarded to comply with a supplier's standards. Dep. at 82; *see also* Tr. at 14.

James River contacted Mrs. Dickson in September 2017, it offered to assist her with startup costs. Tr. at 62; Dep. at 16. James River offered to sell her groceries and other inventory on credit, lend her capital to finish restocking, and purchase new oven equipment to enable her to hold a "grand reopening." Dep. at 16; *see also id.* at 17, 81-82, 86; Pl. Ex. 4, James River Petroleum, Inc. Account Reconciliation of Dickson Convenience Store LLC transactions (hereinafter, "Account Reconciliation"), at 1. Mrs. Dickson agreed to operate the Gas Station with the financial assistance of James River, even though, in hindsight, she acknowledged that managing the Gas Station did not prepare her for all aspects of operating it.[9] Tr. at 62; Dep. at 16. According to Mrs. Dickson, she created Dickson Convenience in July 2017, without the assistance of an attorney, to lease the Gas Station from James River. Tr. at 14-15; *see also* Dep. at 23. *See generally* Partial Stipulation, at paras. 1-4. Dickson Convenience, a limited liability company, was solely owned and managed by Mrs. Dickson.[10] Partial Stipulation, at paras. 1-2; Tr. at 14-15; Dep. at 23.

A.  The Lease Agreement and Consignment Contract

James River and Dickson Convenience entered into the Lease Agreement for the Gas Station on September 21, 2017. Partial Stipulation, at para. 6; Lease Agreement, at preamble, p. 14; Tr. at 16-17. Mrs. Dickson signed the Lease Agreement in her capacity as the owner of Dickson Convenience. Lease Agreement, at p. 14; Tr. at 16. According to Mrs. Dickson, she printed the Lease Agreement after it was emailed to her, and she "looked through it" for approximately a day

---

[9] Despite Mrs. Dickson's perceived inability to obtain financing, she thought she could successfully operate the Gas Station because customers told her it used to be a "very good location . . . a very busy location." Dep. at 21.

[10] Dickson Convenience was organized under the laws of the state of North Carolina. Partial Stipulation, at para. 2; Tr. at 15; Dep. at 23. Due to the lack of an operating agreement, Dickson Convenience defaults to a manager-managed limited liability company, with Mrs. Dickson as the sole designated manager. *See* N.C. Gen. Stat. § 57D-3-20 (2020); *see also* Partial Stipulation, at paras. 1-3; Tr. at 14-15.

10

before she signed it. Tr. at 16, 60-61. Mrs. Dickson did not seek legal advice before she signed and

returned the agreement to James River. *Id.* at 60. James River's chief executive officer signed the

Lease Agreement on September 25, 2017. Lease Agreement, at p. 14.

The Lease Agreement's term began on October 1, 2017, and was to end on June 30, 2026.

*Id.* at § 1.1. The Lease Agreement required Dickson Convenience to pay base rent to James River

on the first day of each month during the term of the lease as follows:

| Base Rent Period: | Base Rent Due (Per Month): |
|---|---|
| October 1, 2017 – October 31, 2017 | $0.00 |
| November 1, 2017 – January 31, 2018 | $1,500.00 |
| February 1, 2018 – April 30, 2018 | $2,250.00 |
| May 1, 2018 – July 31, 2018 | $3,000.00 |
| August 1, 2018 – October 31, 2018 | $3,750.00 |
| November 1, 2018 – October 31, 2019 | $4,500.00 |
| November 1, 2019 – October 31, 2020 | $5,500.00 |
| November 1, 2020 – October 31, 2021 | $6,180.00 |

*Id.* at § 2.1; *see* Tr. at 79-80. Mrs. Dickson confirmed that Dickson Convenience had no obligation

to pay rent for October 2017 and that the monthly rent "slowly increased over time."[11] Tr. at 80.

The Lease Agreement was a "triple net lease," with Dickson Convenience responsible for

several expenses related to the Gas Station. Lease Agreement, at § 2.3. First, Dickson Convenience

had to pay the real estate taxes and utilities associated with the Gas Station. *Id.*; *see also id.* at §

3.1. Second, Dickson Convenience was required to pay for any maintenance, repair, or

replacement expenses arising from the operation of the Gas Station. *Id.* at § 2.3; *see also id.* at §

5. Finally, Dickson Convenience was responsible for insurance premiums associated with general

---

[11] The base rent increased three percent per year beginning November 1, 2021. Lease
Agreement, at § 2.1. In addition, Dickson Convenience had a duty to pay all other rent and
monetary obligations due under the Lease Agreement. *Id.* at § 2.2. According to Mrs. Dickson,
Dickson Convenience never made rent payments to James River; she "just put the cash into" the
account designated by James River. Tr. at 79. Mrs. Dickson confirmed that she was never told
not to pay rent for the Gas Station. *Id.* at 80.

liability and property damage insurance policies, which James River required Dickson Convenience to maintain throughout the term of the Lease Agreement. *Id.* at §§ 2.3, 8.1.

In the event that Dickson Convenience defaulted on its contractual obligations or in the event of default under the Consignment Contract, James River was permitted to either terminate the lease five days after giving notice of the default or re-let the premises. *Id.* at § 13.1. In addition, James River maintained the right to make the payments or perform the acts required of Dickson Convenience under the Lease Agreement, at the expense of the latter, without James River waiving or releasing its contractual obligations. *Id.* at § 13.2. Failure to enforce the contractual rights for any length of time was not deemed a waiver of either party's rights set forth within the Lease Agreement; waiver could only be achieved through a signed writing. *Id.* at § 22.5.

The Lease Agreement required Dickson Convenience to enter into a consignment contract simultaneously with and as a condition precedent to the Lease Agreement. *Id.* at §§ 4.3(b), 11; *see also* Consignment Contract, at preamble. James River and Dickson Convenience entered into the Consignment Contract on September 21, 2017. Partial Stipulation, at para. 7; Consignment Contract, at preamble, para. A, p. 10; *see* Tr. at 17. According to Mrs. Dickson, she printed the Consignment Contract and "look[ed] over it" for approximately a day before signing it on behalf of Dickson Convenience. Tr. at 17-18; *see* Consignment Contract, at p. 10; *see also* Tr. at 60-61; Dep. at 64. Mrs. Dickson signed the Consignment Contract voluntarily, and, like the Lease Agreement, she did not seek legal advice before mailing the agreement back to James River. Tr. at 17, 60; *see also* Dep. at 64. James River's chief executive officer signed the Consignment Contract on behalf of James River. *See* Consignment Contract, at p. 10.

The Consignment Contract's term was set to expire on June 30, 2026, the same date as the expiration of the Lease Agreement. *Id.* at para. A; *see* Lease Agreement, at § 1.1. Pursuant to the

Consignment Contract, James River consigned petroleum products to Dickson Convenience, which the latter sold under the contract. Consignment Contract, at preamble, para. B(1); Tr. at 18, 87; Dep. at 67. Mrs. Dickson acknowledged that James River retained title to all petroleum products delivered to Dickson Convenience until such products were sold in Dickson Convenience's regular course of business. *See* Consignment Contract, at para. B(2)(a); Tr. at 31; *see also* Tr. at 87; Dep. at 67. James River set the retail price for the petroleum products sold by Dickson Convenience, which price would, at a minimum, cover "gross costs."[12] *See* Consignment Contract, at para. C(1). In addition, James River required Dickson Convenience to market the petroleum products under the supplier trade name, "Mobil." *See id.* at preamble, para. B(4).

Dickson Convenience could neither utilize the funds, either by borrowing, offsetting, crediting, or otherwise taking any of the cash fuel proceeds, nor withhold or retain proceeds from the sale of fuel. *Id.* at para. C(5)(b). Rather, James River retained the right to proceeds from the sale of petroleum products, whether purchased with a credit or debit card or with cash, and Dickson Convenience had a duty to deposit all cash proceeds from such sales into James River's bank account each day. *See id.* at paras. B(2)(b), C(5)(a); Partial Stipulation, at para. 9; Tr. at 59; Dep. at 96-97. In the event the cash proceeds from fuel sales were not deposited into James River's bank account due to an intentional act or omission, Dickson Convenience's retention of those proceeds would be deemed an "unauthorized retention" of James River's property. Consignment Contract, at para. C(5)(b). Mrs. Dickson knew the fuel and its sales proceeds were the property of James

---

[12] Per the Consignment Contract, gross costs "include[d] the cost to acquire the [petroleum] Products, including all taxes and Impositions, freight charges, delivery charges, $0.01 per gallon . . . any other applicable Impositions, fees or other charges incurred by [James River], or that [James River] may be required to collect or pay in connection with the [petroleum] Products, including but not limited to, any fees related to the [point-of-sale system] or all card sales . . . ." Consignment Contract, at para. C(1).

River. Tr. at 31, 59; *see also* Dep. at 96-97. Mrs. Dickson did not recall ever being told not to deposit cash fuel proceeds into James River's bank account. Tr. at 58, 80. Mrs. Dickson testified at trial that she only received cash proceeds, which were supposed to be deposited into James River's bank account. *Id.* at 29-30, 59, 90; Dep. at 67; *see also* Dep. at 96-97. However, at her deposition, Mrs. Dickson testified that a portion of the cash fuel proceeds were Dickson Convenience's property because James River received all debit and credit card sales proceeds.[13] Dep. at 69.

If the total daily cash sales of petroleum products did not equal the total daily cash deposits made to James River's bank account, Dickson Convenience was required to deposit the difference into James River's bank account by 9:00 a.m. the following day (the difference being defined in the Consignment Contract as the "Shortfall"). *See* Consignment Contract, at para. C(5)(a). Mrs. Dickson testified she understood this obligation. Tr. at 33. If Dickson Convenience failed to timely deposit the Shortfall, James River was entitled to late fees equaling ten percent of the amount of the Shortfall each day or portion thereof until James River received both the Shortfall and the late fee. *See* Consignment Contract, at para. C(5)(a); *see also* Tr. at 98-99.

James River shared the profits of petroleum product sales with Dickson Convenience. *See* Consignment Contract, at para. C(7)(a); Tr. at 107, 109; Dep. at 94. Under the Consignment Contract, James River was required to pay Dickson Convenience twenty percent of the net profit (sales proceeds less gross costs) from the sale of petroleum products. Consignment Contract, at para. C(7)(a); *see also* Tr. at 107, 109; Dep. at 94.[14] Mrs. Dickson understood that Dickson Convenience would receive a portion of the profit from the sale of James River's fuel. Dep. at 67,

---

[13] Mrs. Dickson's understanding regarding Dickson Convenience's entitlement to a portion of the cash fuel proceeds is discussed further *infra*.

[14] *See supra* note 12.

94. Mrs. Dickson believed, however, that Dickson Convenience was instead entitled to twenty percent of James River's profits from selling the fuel on consignment. *Id.* at 94. According to James River, the profit margin on petroleum products was "pennies per gallon." Tr. at 109. James River credited Dickson Convenience's share of the net profit from fuel sales against the store's rent account monthly. *See id.* at 107-10; Consignment Contract, at paras. C(7), C(8); Dep. at 94. These credits were made pursuant to James River's right to offset and recoup any amount Dickson Convenience owed to it arising under either the Consignment Contract or any other agreement between the parties. Consignment Contract, at para. C(8).

James River supplied Dickson Convenience with a point-of-sale system (the "POS System") to process and track sales of the consigned petroleum products and other goods offered for sale by Dickson Convenience. *See id.* at para. C(4)(d); Dep. at 37-38; *see also* Tr. at 31, 85, 88. The POS System consisted of two components, which James River could access remotely: the equipment to sell petroleum products outside Dickson Convenience at the gas pump and two registers and card readers to sell petroleum products and other goods inside Dickson Convenience. *See* Consignment Contract, at paras. C(4)(d)-(e); Tr. at 46, 64, 98, 100, 103-04; Dep. at 33, 37-38. Dickson Convenience was prohibited from disconnecting, altering, or interfering with the operation of the POS System. Consignment Contract, at para. C(4)(d). The POS System transferred proceeds from all credit and debit card sales, whether for petroleum or other products, directly to James River. *Id.* at paras. C(4)(d), C(5)(a); *see* Tr. at 32, 89-90, 92-93, 100, 104; Dep. at 40-41, 71. These transfers consisted of the proceeds from the sale of petroleum products outside Dickson Convenience at the gas pump paid for by credit or debit card (hereinafter, "Outside Transactions") and all credit and debit card sales of petroleum products or other goods inside Dickson

Convenience (hereinafter, "Inside Transactions"). Consignment Contract, at para. C(4)(e); Tr. at 100, 102-05; Dep. at 69.

James River credited the proceeds from nonfuel credit and debit card transactions against the amounts Dickson Convenience owed to the former for cash sales of fuel. Tr. at 94-95, 105-08; *see also* Consignment Contract, at para. C(8). The crediting process was effectuated by James River's accounting software, "DM2" (hereinafter, "Accounting Software"), which cross-netted liabilities on a daily basis. *See* Tr. at 85, 87-90, 97-98, 112. If Dickson Convenience's nonfuel credit and debit card transactions exceeded the other amounts owed to James River, then James River was obligated to remit that amount to Dickson Convenience in cash.[15] *Id.* at 97, 108.

James River's POS System incurred network processing fees with every debit and credit card transaction. *See* Consignment Contract, at para. C(4)(e); Tr. at 93. James River paid all processing fees for credit and debit card sales related to Outside Transactions, while Dickson Convenience was responsible for paying processing fees for Inside Transactions.[16] *See*

---

[15] The amounts due to Dickson Convenience never exceeded the amounts otherwise owed to James River, and Dickson Convenience never received cash remittances from James River. Tr. at 108.

[16] The Consignment Contract states the rights and obligations of James River and Dickson Convenience as follows:

> Card transactions shall be the responsibility of Consignee. The Consignee shall pay all credit card processing fees related to Inside Transactions, including but not limited to, point-of-sale fees and all other costs incident to its acceptance of credit cards in lieu of cash payment for products and services sold on the Premises which are not part of Outside Transactions, as hereinafter defined, ("Inside Transactions"). The Consignor will pay all credit card processing fees related to "Outside Transactions" which shall only include the fees generated from customers paying with a credit card for the purchase of [petroleum] Products. Consignee agrees to comply with any credit card and electronic funds transfer agreements that Consignor may enter into from time to time and/or as applicable to enter into directly with a credit card processor such credit card and/or electronic funds transfer agreements as may be required in connection with the acceptance of credit and debit cards at stations marketing under the Supplier trade name. Consignee shall be liable

Consignment Contract, at para. C(4)(e); Tr. at 93-95; Dep. at 83-84; *see also* Lease Agreement, at § 4.3(a). James River credited Dickson Convenience for the processing fees incurred on Outside Transactions by applying them against Dickson Convenience's liabilities. Tr. at 94-95. *See generally* Consignment Contract, at paras. C(4)(e), C(8).

In the event Dickson Convenience defaulted under the Consignment Contract, the Consignment Contract was terminated, the Gas Station closed, or Dickson Convenience prevented James River from delivering petroleum products, James River retained the right to unilaterally terminate the Consignment Contract and accelerate all amounts due and payable to it. Consignment Contract, at paras. F(1), F(1)(a), F(2)-(3). Dickson Convenience also had to remove, at its own expense, all of Mobil's marks at the Gas Station consistent with James River's instructions and pay for any damages asserted against James River by any third party, including Mobil, with respect to Dickson Convenience's performance or non-performance under the Consignment Contract. *Id.* at paras. F(1)(b)-(c).

The Lease Agreement and Consignment Contract both contain cross default provisions, making a breach under either the agreement a breach under both. *See* Lease Agreement, at § 11; Consignment Contract, at para. G(2). The Lease Agreement holds James River harmless for liabilities, obligations, and other costs and expenses incurred caused by Dickson Convenience's failure to comply with the environmental compliance provisions of the Lease Agreement. *See* Lease Agreement, at § 20.7. The Consignment Contract likewise indemnifies James River for any failure by Dickson Convenience to comply with any environmental protection laws. Consignment

---

for all credit card charge-backs resulting from the Consignee's acceptance of credit cards.

Consignment Contract, at para. C(4)(e).

Contract, at para. E(4). Dickson Convenience also agreed to hold James River harmless for liabilities, obligations, and costs and expenses, including reasonable attorney's fees, asserted against or incurred by James River arising from Dickson Convenience's use of the Gas Station. Lease Agreement, at § 7. The Consignment Contract holds James River harmless against all loss, damage, and costs and expenses arising out of Dickson Convenience's failure to comply with the Consignment Contract or from the operation of the Gas Station. *See* Consignment Contract, at para. E(12)*.* The "costs and expenses" under both the Lease Agreement and the Consignment Contract include reasonable attorney's fees. *See* Lease Agreement, at §§ 7, 22.11; Consignment Contract, at para. E(12).[17]

The Lease Agreement and Consignment Contract also both provide that the laws of the Commonwealth of Virginia will govern in the event of a legal dispute. Lease Agreement, at § 22.10; Consignment Contract, at para. R. Further, the Virginia state courts have exclusive jurisdiction over all disputes, claims, and controversies arising under either the Lease Agreement or the Consignment Contract. Lease Agreement, at § 22.10; Consignment Contract, at para. R.

### B.  The Guaranty Agreement

Attached to the Consignment Contract is a guaranty agreement, which agreement was also required by the Lease Agreement. Lease Agreement, at § 12; Pl. Ex. 3, Guaranty Agreement between Nikole Dickson and James River Petroleum, Inc., dated September 21, 2017 (hereinafter, "Guaranty Agreement"); Tr. at 18.[18] James River, Dickson Convenience (by Mrs. Dickson), and

---

[17] Section 22.11 of the Lease Agreement is more specific than either Section 7 of that document or Paragraph E(12) of the Consignment Contract, as Section 22.11 specifically provides for attorney's fees equal to 33% of the amount owed in the event of a breach of the lease. Lease Agreement, at §§ 7, 22.11; Consignment Contract, at para. E(12).

[18] The Guaranty Agreement was attached to the Complaint as an exhibit to the Consignment Contract. *See* Consignment Contract, at Ex. B.

Mrs. Dickson, in her individual capacity, entered into the Guaranty Agreement simultaneously with the Lease Agreement and Consignment Contract on September 21, 2017. Partial Stipulation, at para. 8; Guaranty Agreement, at preamble, p. 5; *see* Tr. at 18-19. According to Mrs. Dickson, she received the Guaranty Agreement with the Lease Agreement and looked over it for approximately a day before signing it voluntarily and without obtaining legal advice. Tr. at 18-19, 60-61; *see also* Dep. at 65. Mrs. Dickson confirmed that she signed the Guaranty Agreement twice, once in her individual capacity and once as the sole member of Dickson Convenience. Tr. at 18-19. Under the Guaranty Agreement, Mrs. Dickson unconditionally guaranteed the full and prompt payment of Dickson Convenience's obligations to pay James River and Dickson Convenience's prompt performance of all covenants, conditions, and agreements under the Lease Agreement and Consignment Contract. Guaranty Agreement, at para. 1.[19] The Guaranty Agreement enabled James River to pursue Mrs. Dickson individually without first seeking recourse against Dickson Convenience. *Id.* at para. 3.

In the event that James River sought to enforce the Guaranty Agreement, Mrs. Dickson agreed to pay James River's costs and expenses, including reasonable attorney's fees equal to thirty-three percent of the outstanding amount due to James River arising from the latter's collection efforts.[20] *Id.* at para. 1. As with the Lease Agreement and Consignment Contract, the

---

[19] At her deposition, Mrs. Dickson testified that she was "not really sure" what kind of agreement the Guaranty Agreement was and further was unclear as to her obligations under it. Dep. at 65. However, at trial, Mrs. Dickson testified that she understood her obligations to pay under the Lease Agreement and Consignment Contract by virtue of signing the Guaranty Agreement. Tr. at 62.

[20] The Lease Agreement also provides James River with attorney's fees and costs of no less than thirty-three percent of the amount owed in the event such services are required to enforce the lease terms. Lease Agreement, at § 22.11.

Guaranty Agreement contains a choice of law provision designating the laws of the

Commonwealth of Virginia as governing in the event of a legal dispute. *Id.* at para. 12.

### C.  The Operation of Dickson Convenience

On September 13, 2017, Mrs. Dickson set forth the financial assistance needed to reopen

the Gas Station in an email addressed to S. Firkins, a James River employee. Def. Ex. S, Email

dated September 13, 2017, from Nikole Dickson to S. Firkins, employee at James River Petroleum,

Inc. (hereinafter, "September 13, 2017 Email to S. Firkins"), at 1. Mrs. Dickson requested that rent

for September 2017 through December 2017 be waived. *Id.* In addition, Mrs. Dickson requested

$50,000.00 in capital to help with the Gas Station's startup costs, equipment, and replacement of

expired inventory. *Id.* Mrs. Dickson believed that with James River's support, the Gas Station

could be fully operational by October 2017. *Id.* In anticipation of reopening, Mrs. Dickson

represented that she had recruited vendors to donate free products for such event. *Id.*

Dickson Convenience reopened the Gas Station as its new operator on September 29, 2017.

*See* Account Reconciliation, at 5 (indicating first fuel sale occurred September 29, 2017); *see also*

Tr. at 12, 14. In addition to Mrs. Dickson, Dickson Convenience employed Mr. Dickson and the

Dicksons' daughter. Tr. at 22; Dep. at 28-29. *See generally* Tr. at 70-78. Mrs. Dickson worked six

to seven days each week for ten to twelve hours each day. Dep. at 22; *see* Tr. at 27, 70. Mr. Dickson

worked Friday and Saturday nights as well as Sunday nights when his work schedule permitted.[21]

Tr. at 23, 27. The Dicksons' daughter, Makayla Dickson, worked five to six nights per week. *Id.*

at 27. Dickson Convenience also had one full-time employee and one part-time employee. *Id.*;

Dep. at 31; *see, e.g.*, Pl. Ex. 6, Dickson Convenience October 2017 Profit and Loss Statement and

---

[21] According to the Debtors' schedules, Mr. Dickson was employed as a Training Specialist
Advisor at GD Information Technology, Inc. Schedule I, Case No. 19-70934-SCS, ECF No. 1, at
45.

PNC Bank Statement (hereinafter, "October 2017 Profit and Loss Statement"), at 2-3.[22] The full-time employee worked forty hours per week for a wage of $10.00 an hour, and the part-time employee worked for a wage of $8.00 an hour. Dep. at 32.

Dickson Convenience opened an operating account at PNC Bank to receive and disburse funds in the normal course (hereinafter, "Operating Account"). *See* October 2017 Profit and Loss Statement, at 4, 6; Tr. at 28, 51; Dep. at 41-42. In addition to the Operating Account, Dickson Convenience set up a second PNC Bank account for deposits and disbursements related to the sale of North Carolina lottery tickets, which began in December 2017 (hereinafter, "Lottery Account").[23] *See* Pl. Ex. 24, Dickson Convenience PNC Bank Statements for Lottery Account dated September 2017 through April 2019, at 1-2, 5-7; Tr. at 21, 51, 54; Dep. at 121-22.[24] James River opened a BB&T bank account in November 2017 to receive deposits from Dickson Convenience of the cash fuel sales proceeds pursuant to the Consignment Contract (hereinafter, "James River's Account"). *See* Pl. Ex. 5, James River Petroleum, Inc., BB&T Statements dated November 2017 through May 2019, at 1; Tr. at 28, 30, 79, 90-91; Dep. at 67, 75; Consignment Contract, at para. C(5)(a).

In the normal course, Dickson Convenience received cash from the sales of fuel, nonfuel merchandise, and lottery tickets. Tr. at 27, 47. Dickson Convenience could deposit its cash into

---

[22] The October 2017 Profit and Loss Statement was presented among Mrs. Dickson's trial exhibits as Exhibit A. *See* Def. Ex. A.

[23] Dickson Convenience received invoices indicating the amount of cash owed for the sale of North Carolina lottery tickets. Dep. at 48-49, 52, 122. To pay the lottery invoices, Dickson Convenience either deposited cash proceeds from lottery sales directly into the Lottery Account or electronically transferred funds from the Operating Account to the Lottery Account. *See* Tr. at 54-55; Dep. at 121-22; *see, e.g.*, Pl. Ex. 24, Dickson Convenience PNC Bank Statements for Lottery Account dated September 2017 through April 2019, at 6, 9 (December 2017 and January 2018 Statements).

[24] Mrs. Dickson's Exhibits A through R included the Lottery Account statements. *See* Def. Exs. A-R.

either the Operating Account, the Lottery Account, or James River's Account. *See id.* at 28, 34, 51, 54-55; Dep. at 34; *see also* Dep. at 42-44, 111, 140-41. While Mrs. Dickson was primarily responsible for depositing cash into one of the three bank accounts, sometimes her daughter or another employee would make the deposits. Dep. at 40. If the banks were closed, the cash would be placed in Dickson Convenience's safe until the banks reopened. Tr. at 28; Dep. at 44. Mrs. Dickson did not believe that anyone stole or took cash from Dickson Convenience during its operation of the Gas Station. Tr. at 30; Dep. at 40. On November 20, 2017, James River's Risk Manager, Amy Bittner (hereinafter, "Ms. Bittner"), emailed Mrs. Dickson to advise that Dickson Convenience owed James River $15,415.35 for cash fuel sales made in October 2017 and that such funds should be deposited into James River's Account. Pl. Ex. 30, Email dated November 20, 2017, from Amy Bittner, Risk Manager for James River Petroleum, Inc., to Nikole Dickson, at 1. On November 24, 2017, Dickson Convenience made its first deposit of James River's cash fuel proceeds since its opening in the amount of $11,572.00. *See* Pl. Ex. 5, at 1 (November 2017 James River Account Statement); Tr. at 91; Dep. at 68, 76.[25]

When the store reopened, Dickson Convenience was not fully stocked with inventory.[26] *See* Def. Ex. S, Email exchange dated October 5, 2017, between Nikole Dickson and Greg Natvig, Vice-President of Operations for James River Petroleum, Inc. (hereinafter, "October 5, 2017 Email Exchange"), at 1. Despite the lack of inventory, Dickson Convenience began selling James River's fuel in the ordinary course of business. *See* Account Reconciliation, at 5. On October 5, 2017, Mrs.

---

[25] Mrs. Dickson deposited the cash fuel proceeds into the Operating Account until James River's Account was established. Dep. at 76-77.

[26] According to Mrs. Dickson, prior to the Gas Station closing in August 2017, the store was likewise never fully stocked with inventory. Def. Ex. S, Email exchange dated October 23-25, 2017, between Nikole Dickson and Greg Natvig, Vice-President of Operations for James River Petroleum, Inc., at 1; Tr. at 67.

Dickson emailed Greg Natvig, Vice-President of Operations for James River (hereinafter, "Mr. Natvig"), regarding a lack of funds to restock inventory. October 5, 2017 Email Exchange, at 1. Mrs. Dickson claimed she agreed to operate the Gas Station with the expectation that she would receive financial assistance from James River. *Id.* at 2. According to Mrs. Dickson, Dickson Convenience had already sold all of its most popular inventory items and was forced to turn away customers. *Id.* at 1. At that time, Dickson Convenience had, on average, $110.00 in sales each day. *Id.* Mrs. Dickson believed she was "set up to fail" because Dickson Convenience was earning only enough money to pay staff and rent expenses. *Id.* at 2. In response, Mr. Natvig stated that James River's accountants were busy completing a year-end financial report, and he would respond further later that day. *Id.* at 1. The next day, on October 6, 2017, James River advanced $6,550.00 to Dickson Convenience to assist with restocking the Gas Station. *See* Account Reconciliation, at 4; Dep. at 82. On October 10, 2017, the earmarked funds were electronically transferred into the Operating Account. *See* October 2017 Profit and Loss Statement, at 8.

On October 23, 2017, Mr. Natvig informed Mrs. Dickson that James River supported changing the Gas Station's oven equipment but required Mrs. Dickson to select the desired unit. Def. Ex. S, Email exchange dated October 23-25, 2017, between Nikole Dickson and Greg Natvig, Vice-President of Operations for James River Petroleum, Inc. (hereinafter, "October 23-25, 2017 Email Exchange"), at 2. Mrs. Dickson responded that day that she had "it cover[ed]." *Id.* Two days later, Mr. Natvig inquired about inside sales. *Id.* Mrs. Dickson indicated that daily inside sales of nonfuel products averaged only $250.00, and Dickson Convenience still was not making enough money to cover expenses.[27] *Id.*; Tr. at 67-68. Mr. Natvig inquired if he could do anything to help

---

[27] In contrast, prior to the August 2017 closure of the Gas Station, the store averaged sales of $350.00 of nonfuel products per day. October 23-25, 2017 Email Exchange, at 1; Tr. at 67.

Dickson Convenience increase sales. October 23-25, 2017 Email Exchange, at 1; *see also* Tr. at 68. Mrs. Dickson responded less than twenty minutes later, indicating that Dickson Convenience was selling mostly cigarettes and beer, which had "very low profit margin[s]," and that the process to restock the store for the November 11, 2017 grand reopening was "going really slow." October 23-25, 2017 Email Exchange, at 1; Tr. at 67. Mrs. Dickson believed a grand reopening would make the store, which had a "bad history," a "success" again. September 13, 2017 Email to S. Firkins, at 1.

On November 26, 2017, Mrs. Dickson emailed Mr. Natvig, stating that Dickson Convenience was "beyond broke." Def. Ex. S, Email exchange dated November 26-27, 2017, between Nikole Dickson and Greg Natvig, Vice-President of Operations for James River Petroleum, Inc. (hereinafter, "November 26-27, 2017 Email Exchange"), at 2; Tr. at 68. Mrs. Dickson projected $309.00 in daily nonfuel sales for December 2017, which amount would not cover basic expenses.[28] November 26-27, 2017 Email Exchange, at 2; Tr. at 68; Dep. at 101. Mrs. Dickson represented that she was not being paid and that Dickson Convenience did not have sufficient cash flow to keep the store fully stocked with inventory. November 26-27, 2017 Email Exchange, at 2; Tr. at 68; *see* Dep. at 100-03, 105. Contrary to the November 26, 2017 email to Mr. Natvig, Mrs. Dickson testified at both her deposition and at trial that she and her family received wages for the month of November 2017 totaling $4,400.00.[29] Tr. at 22, 70-71; Dep. at 109-10; Pl. Ex. 7, Dickson Convenience November 2017 Profit and Loss Statement and PNC Bank

---

[28] According to Mrs. Dickson, Dickson Convenience's payroll exceeded income in November 2017. November 26-27, 2017 Email Exchange, at 2.

[29] According to Mrs. Dickson, this amount was shared with her husband and daughter. Tr. at 70; Dep. at 109.

Statement (hereinafter, "November 2017 Profit and Loss Statement"), at 3.[30] Mrs. Dickson indicated that she had used personal funds and "maxed out [a] credit card to try to keep the store afloat[.]" November 26-27, 2017 Email Exchange, at 2; Tr. at 68-69. Mrs. Dickson believed Dickson Convenience was "out of options." November 26-27, 2017 Email Exchange, at 2; Tr. at 68-69. The next day, Mr. Natvig requested more detail about Dickson Convenience's inside nonfuel sales to enable him to better understand the financial situation. November 26-27, 2017 Email Exchange, at 1; Tr. at 69; *see also* Dep. at 101. Mr. Natvig believed that Mrs. Dickson's projected December 2017 total gross income "seem[ed] low." November 26-27, 2017 Email Exchange, at 1.

On November 28, 2017, Mr. Natvig and Ms. Bittner requested that Mrs. Dickson reconcile Dickson Convenience's transactions from November 1, 2017, through November 3, 2017, with the daily transaction report James River received from the POS System. Pl. Ex. 31, Email dated November 28, 2017, from Amy Bittner, Risk Manager for James River Petroleum, Inc., to Greg Natvig, Vice-President of Operations for James River Petroleum, Inc., and Nikole Dickson (hereinafter, "November 28, 2017 Email to Mr. Natvig and Mrs. Dickson"), at 1. *See generally* Tr. at 45-46, 64, 98; Dep. at 37. Mr. Natvig wanted to ensure that James River and Dickson Convenience were registering the same daily fuel and nonfuel sales totals. November 28, 2017 Email to Mr. Natvig and Mrs. Dickson, at 1. Ms. Bittner attached a "Fuel Product/Price Level Report" for each of the three days to the email. *See id.* at 1, 3-8. The reports set forth the quantities of the various fuel products sold, the number of fuel sales transactions, and the dollar amount of credit and debit card as well as cash proceeds generated each day. *Id.* at 3-8. In response, Mrs.

---

[30] The November 2017 Profit and Loss Statement was tendered as Mrs. Dickson's Exhibit B. *See* Def. Ex. B.

Dickson emailed a daily network product report for November 1, 2017, to Mr. Natvig and Ms. Bittner with her calculations of Dickson Convenience's total fuel and nonfuel sales and the amount of cash received. Pl. Ex. 32, Email dated November 30, 2017, from Nikole Dickson to Greg Natvig, Vice-President of Operations for James River Petroleum, Inc., and Amy Bittner, Risk Manager for James River Petroleum, Inc. (hereinafter, "November 30, 2017 Email to Greg Natvig and Amy Bittner"), at 1. The daily network product reports were generated by the cash registers' internal accounting software, the "Commander 2 system." Dep. at 37. Dickson Convenience's network product report matched James River's report regarding the total dollar amount of fuel sales for November 1, 2017; however, Mrs. Dickson's personal calculations of cash fuel proceeds differed from James River's calculations, exhibiting a difference of approximately $850.00. *Compare* November 30, 2017 Email to Greg Natvig and Amy Bittner, at 1, *with* November 28, 2017 Email to Mr. Natvig and Mrs. Dickson, at 3. According to James River's calculations, cash fuel proceeds for November 1, 2017, totaled $1,233.71. November 28, 2017 Email to Mr. Natvig and Mrs. Dickson, at 3. In contrast, Mrs. Dickson calculated cash fuel receipts of $383.00 for that day. November 30, 2017 Email to Greg Natvig and Amy Bittner, at 1.

Dickson Convenience continued to sustain losses in December 2017, just as Mrs. Dickson had predicted the prior month. Dep. at 103-04; *see* Pl. Ex. 8, Dickson Convenience December 2017 Profit and Loss Statement and PNC Bank Statement (hereinafter, "December 2017 Profit and Loss Statement"), at 3 (indicating net loss of $3,349.13).[31] Even though Mrs. Dickson expected Dickson Convenience to incur losses into 2018, the company continued to operate the Gas Station. Tr. at 69 (admitting that she kept operating the Gas Station because she "didn't really know what else to

---

[31] The December 2017 Profit and Loss Statement was tendered among Mrs. Dickson's trial exhibits as Exhibit C. *See* Def. Ex. C.

do"); Dep. at 103-04. During that time frame, Mrs. Dickson believed that communications from

Mr. Natvig telling her to "keep trying" represented a mutual understanding that she could use

James River's cash fuel proceeds to fund store operations. Dep. at 103, 105-06 (discussing the

November 26-27, 2017 Email Exchange with Mr. Natvig and concurrent conversations); *see also*

Tr. at 30-31 (testifying as to her (Mrs. Dickson's) belief that James River knew the cash fuel

proceeds were being used for operating costs); Dep. at 106 (same).

Dickson Convenience sold a variety of non-petroleum goods, among which were groceries,

beer, and cigarettes.[32] Dep. at 32, 105. Cigarettes and beer were the best sellers but had low profit

margins;[33] groceries did not sell well. Tr. at 67; Dep. at 105; October 23-25, 2017 Email Exchange,

at 1. According to Mrs. Dickson, Dickson Convenience sold only $300.00 of non-petroleum

products some days. Tr. at 29. In contrast, Dickson Convenience had daily fuel sales averaging

approximately $3,000.00.[34] *See* Account Reconciliation, at 5-16. As a result, Dickson

Convenience struggled to operate the Gas Station at a profit. According to Elyse Hawthorne, Risk

Manager for James River (hereinafter, "Ms. Hawthorne"), "fuel [was] the draw to get traffic into

the store to buy other [goods]." Tr. at 112; *see also id.* at 83. A store operator could be profitable

if they had "successful inside sales." *Id.* at 112.

James River sent Dickson Convenience consignment calculator reports several times a

month, notifying Dickson Convenience of the outstanding shortfall of cash fuel proceeds owed to

James River. *Id.* at 42-43; Dep. at 87; *see also* Tr. at 96; *see, e.g.*, Pl. Ex. 33, Email dated March

---

[32] Dickson Convenience also sold newspapers, ice cream, and kerosene. Dep. at 47, 51, 147-48.
Dickson Convenience controlled the markup on non-petroleum goods. Tr. at 112.
[33] The profit per pack of cigarettes was between seven and fifteen cents. Dep. at 105.
[34] The Court averaged the gross dollar amount of daily fuel sales set forth on James River's
Account Reconciliation to arrive at $3,000.00 as the approximate average gross dollar amount of
fuel products sold per day. Account Reconciliation, at 5-16.

8, 2018, from Amy Bittner, Risk Manager for James River Petroleum, Inc., to Nikole Dickson
(hereinafter, "March 8, 2018 Email to Mrs. Dickson"), at 1-2. James River's Accounting Software
generated the consignment calculator reports. *See* Tr. at 45-46. Mrs. Dickson requested
instructions from James River in 2017 regarding the interpretation of the consignment calculator
reports but "[did not] get too far on it." *Id.* at 43; *see also* Dep. at 69-70 (indicating that she "did
not receive a lot of guidance" regarding how the cash amounts owed under the Consignment
Contract were calculated); Dep. at 91 ("I had asked . . . to have a conversation, and we never—I
never followed through."); Dep. at 95 (indicating she asked for explanations regarding assessed
fees). At her deposition, Mrs. Dickson admitted that while there were some numbers on the
consignment calculator reports that she did not understand, she understood calculations pertinent
to the amounts of fuel and groceries sold and the credit card fees. Dep. at 83-85. According to Mrs.
Dickson, she never received explanations regarding the "fuel variance," "gross credit," or the other
columns on the report and did not understand what "fuel fees" were at all. *Id.* at 90, 92. Mrs.
Dickson assumed that the "gross credit" total comprised all credit card receipts, that "credit fees"
were fees charged on James River's POS System, and that "net credit" was the amount James
River received from the credit card company. *Id.* at 90-92.

Notwithstanding the lack of guidance and understanding, Mrs. Dickson admitted that the
consignment calculator figures matched "fairly closely" with the amounts on the monthly reports
she generated at the register, the latter of which she also believed were accurate.[35] Tr. at 44; Dep.
at 38-39. Despite her own differing calculations in some instances, Mrs. Dickson conceded that
James River's calculations were approximately accurate and had no reason to believe they were

---

[35] Mrs. Dickson testified that James River inadvertently treated debit card sales as cash payments
when Dickson Convenience first opened but later corrected this error on the consignment
calculator reports. Tr. at 44, 46.

inaccurate. *See* Tr. at 46-49 (acknowledging the accuracy of James River's cash proceeds shortfall calculations and the amounts set forth on the consignment calculator reports); Dep. at 78, 80, 85, 88, 90 (conceding that the total fuel sales and Dickson Convenience's total cash deposits, as reflected in James River's Account Reconciliation, were "close" to the actual amounts);[36] *see also* Tr. at 56-57 (concurring with the accuracy of the consignment calculator reports and Account Reconciliation). At no point did Mrs. Dickson dispute James River's representations on the consignment calculator reports regarding the amount of cash fuel proceeds Dickson Convenience owed to James River.[37] *See* Tr. at 48. For these reasons, the Court finds James River's fuel reports as controlling.

Mrs. Dickson utilized the QuickBooks accounting software to record Dickson Convenience's monthly cash flow.[38] *Id.* at 20-21. Mrs. Dickson personally input Dickson Convenience's income and expenses into QuickBooks but conceded that she "was new to using Quickbooks" and hoped she input the information correctly.[39] *See id.* at 20-21. Mrs. Dickson admitted, however, that the information was not always complete. Dep. at 125-26 (noting that only the January 2018 Profit and Loss Statement appeared to contain complete information). Mrs. Dickson used QuickBooks to generate profit and loss statements, but she did so only in anticipation of litigation. Tr. at 63-64 (admitting that the profit and loss statements were prepared after James

---

[36] Ms. Hawthorne prepared the Account Reconciliation, with assistance from James River's chief financial officer, using the Accounting Software's compilation of data acquired from the POS System; invoices generated from fuel sold by James River; and the Gas Station's records. Tr. at 85-86, 88.

[37] Dickson Convenience's profit and loss statements did not contain the total cash received each month. Tr. at 45, 57.

[38] Dickson Convenience never had an accountant. Partial Stipulation, at para. 5; Tr. at 15; Dep. at 32.

[39] The profit and loss statements did not include income streams related to lottery sales. *See* Tr. at 21.

River filed the Complaint); *see also id.* at 81-82 (conceding that Dickson Convenience's profit and loss statements were never printed during its operation). Mrs. Dickson confessed that some, but not all, of the amounts she input were from memory.[40] *Id.* at 82. According to Mrs. Dickson, "[she and her counsel] went back through and made sure all the invoices were entered in correctly." Dep. at 27.

Dickson Convenience's profit and loss statements reveal multiple discrepancies when compared to the Operating Account statements for the related months. For example, Dickson Convenience's Operating Account statement reflects a deposit of $331.50 on November 21, 2017, but the corresponding profit and loss statement does not list this amount. *Compare* November 2017 Profit and Loss Statement, at 1 (Dickson Convenience's deposit journal entries), *with id.* at 6 (Operating Account deposit entry). Likewise, Dickson Convenience's December 2017 Operating Account statement shows that $932.07 was deposited on December 4, 2017, but the corresponding profit and loss details do not reflect such amount. *Compare* December 2017 Profit and Loss Statement, at 1 (deposit journal entries), *with id.* at 5 (Operating Account deposit entry). Dickson Convenience's May 2018 Operating Account statement indicates that $1,460.00 was deposited on May 9, 2018; however, the corresponding profit and loss statement does not contain a like entry. *Compare* Pl. Ex. 13, Dickson Convenience May 2018 Profit and Loss Statement and PNC Bank Statement (hereinafter, "May 2018 Profit and Loss Statement"), at 3 (deposit journal entries), *with id.* at 9 (Operating Account deposit entry).[41] Dickson Convenience's Operating Account statement indicates $707.00 was deposited on August 7, 2018, and $1,140.00 on August 13, 2018; however,

---

[40] Among the amounts based upon Mrs. Dickson's memory was the number of hours she, her husband, and her daughter worked each month. Tr. at 82.

[41] The May 2018 Profit and Loss Statement appeared as Exhibit H in Mrs. Dickson's trial exhibits. *See* Def. Ex. H.

the associated profit and loss statement does not include such deposits. *Compare* Pl. Ex. 16,

Dickson Convenience August 2018 Profit and Loss Statement and PNC Bank Statement

(hereinafter, "August 2018 Profit and Loss Statement"), at 3 (deposit journal entries), *with id.* at

12 (Operating Account ATM deposit entries).[42] Finally, Dickson Convenience's February 2019

Operating Account statement reflects that $500.00 was deposited on February 7, 2019, but the

corresponding profit and loss statement does not contain such deposit entry. *Compare* Pl. Ex. 22,

Dickson Convenience February 2019 Profit and Loss Statement and PNC Bank Statement

(hereinafter, "February 2019 Profit and Loss Statement"), at 3 (deposit journal entries), *with id.* at

11 (Operating Account ATM deposit entry).[43] Based upon the Court's comparison of the Operating

Account statements to the corresponding profit and loss statements and Mrs. Dickson's testimony

concerning the data input for the latter, including that some entries were not contemporaneously

made, the Court finds that Dickson Convenience's records were not prepared using reliable

accounting principles and methods. Therefore, the Court will accord little weight to the

QuickBooks-generated profit and loss statements.

At trial, James River introduced four emails transmitting consignment calculator reports to

Mrs. Dickson during Dickson Convenience's operation of the Gas Station. *See* Tr. at 42, 48-50

(discussing consignment calculator reports for February, April, May, and September 2018). A fifth

consignment calculator report, for June 2018, was also included among James River's admitted

exhibits. On March 8, 2018, Ms. Bittner emailed Dickson Convenience's February 2018

consignment calculator report to Mrs. Dickson. March 8, 2018 Email to Mrs. Dickson, at 1-2; *see*

---

[42] Mrs. Dickson proffered the August 2018 Profit and Loss Statement within her trial exhibits as
Exhibit K. *See* Def. Ex. K.
[43] Mrs. Dickson included the February 2019 Profit and Loss Statement as her Exhibit Q. *See* Def.
Ex. Q.

Tr. at 42. The report indicated that Dickson Convenience received $42,642.33 in James River's cash fuel proceeds in February 2018 and owed James River a cumulative outstanding balance of cash fuel proceeds of $9,307.77 after cross-netting Dickson Convenience's credits and subtracting the amount of cash deposited into James River's Account. March 8, 2018 Email to Mrs. Dickson, at 2; Pl. Ex. 5, at 11 (February 2018 James River Account Statement) (indicating that $2,423.77 was deposited into James River's Account); *see also* Tr. at 96-97 (testimony by Ms. Hawthorne explaining the amounts set forth on the consignment calculator reports). Mrs. Dickson testified that the amount of cash fuel proceeds received by Dickson Convenience listed in the February 2018 consignment calculator report was correct.[44] Tr. at 47. Mrs. Dickson likewise agreed that Dickson Convenience's February 2018 Operating Account statement correctly reflected cash deposits totaling $26,638.20. *Id.* at 51; Pl. Ex. 10, Dickson Convenience February 2018 Profit and Loss Statement and PNC Bank Statement (hereinafter, "February 2018 Profit and Loss Statement"), at 6.[45]

On May 4, 2018, Ms. Bittner sent the April 2018 consignment calculator report to Mrs. Dickson via email. Pl. Ex. 34, Email dated May 4, 2018, from Amy Bittner, Risk Manager for James River Petroleum, Inc., to Nikole Dickson (hereinafter, "May 4, 2018 Email to Mrs. Dickson"), at 1, 3; *see* Tr. at 48. The April 2018 consignment calculator report indicated that Dickson Convenience received $51,433.31 in James River's cash fuel proceeds, which Mrs. Dickson concurred was accurate. May 4, 2018 Email to Mrs. Dickson, at 3; Tr. at 49. Dickson Convenience had accumulated an outstanding balance of cash fuel proceeds owed of $64,274.85,

---

[44] Dickson Convenience's total cash deposits into the Operating Account are reflected on the Operating Account statements as "Deposits" and "ATM deposits." Tr. at 52, 54; Dep. at 42, 111, 115-16.
[45] The February 2018 Profit and Loss Statement was admitted as Mrs. Dickson's Exhibit E. *See* Def. Ex. E.

that amount having increased by $6,662.26 in April 2018 after all credits were applied.[46] May 4, 2018 Email to Mrs. Dickson, at 3; Pl. Ex. 5, at 18 (April 2018 James River Account Statement) (indicating that $8,974.77 was deposited into James River's Account). Dickson Convenience's April 2018 Operating Account statement reflected total cash deposits of $29,603.61; Mrs. Dickson confirmed the accuracy of this amount. Pl. Ex. 12, Dickson Convenience April 2018 Profit and Loss Statement and PNC Bank Statement (hereinafter, "April 2018 Profit and Loss Statement"), at 8;[47] *see* Tr. at 53.

On June 6, 2018, Ms. Bittner provided the May 2018 consignment calculator report to Mrs. Dickson. Pl. Ex. 35, Email dated June 6, 2018, from Amy Bittner, Risk Manager for James River Petroleum, Inc., to Nikole Dickson (hereinafter, "June 6, 2018 Email to Mrs. Dickson"), at 1, 3; *see* Tr. at 49. The May 2018 consignment calculator report reflected receipt of cash fuel proceeds by Dickson Convenience of $50,215.71 and that Dickson Convenience owed James River accumulated cash fuel proceeds of $66,457.79. June 6, 2018 Email to Mrs. Dickson, at 3; *see* Tr. at 49; Pl. Ex. 5, at 22 (May 2018 James River Account Statement) (indicating that $5,927.58 was deposited into James River's Account). Mrs. Dickson agreed that the amount of cash fuel proceeds set forth by James River's May 2018 consignment calculator report as having been received by Dickson Convenience was accurate. Tr. at 49. Dickson Convenience's May 2018 Operating Account statement reflected total cash deposits of $34,524.66, the accuracy of such amount being confirmed by Mrs. Dickson. May 2018 Profit and Loss Statement, at 8; *see* Tr. at 53.

---

[46] Mrs. Dickson testified at her deposition that she did not believe Dickson Convenience owed such a large amount but admitted that she lacked knowledge regarding the amount of fees and additional charges assessed by James River. Dep. at 93-94.

[47] The April 2018 Profit and Loss Statement was tendered among Mrs. Dickson's trial exhibits as Exhibit G. *See* Def. Ex. G.

On July 6, 2018, Ms. Bittner emailed Mrs. Dickson the June 2018 consignment calculator report. Pl. Ex. 36, Email dated July 6, 2018, from Amy Bittner, Risk Manager for James River Petroleum, Inc., to Nikole Dickson (hereinafter, "July 6, 2018 Email to Mrs. Dickson"), at 1-2. The June 2018 report states that Dickson Convenience received $57,760.18 in cash fuel proceeds that month and owed James River an outstanding balance of cash fuel proceeds of $80,159.85. *Id.* at 2; Pl. Ex. 5, at 25 (June 2018 James River Account Statement) (indicating that $7,777.38 was deposited into James River's Account). Dickson Convenience's June 2018 Operating Account statement listed total cash deposits of $27,869.01. Pl. Ex. 14, Dickson Convenience June 2018 Profit and Loss Statement and PNC Bank Statement (hereinafter, "June 2018 Profit and Loss Statement"), at 10.[48]

Mrs. Dickson received the September 2018 consignment calculator report from Ms. Bittner on October 5, 2018. Pl. Ex. 38, Email dated October 5, 2018, from Amy Bittner, Risk Manager for James River Petroleum, Inc., to Nikole Dickson (hereinafter, "October 5, 2018 Email to Mrs. Dickson"), at 1-2; *see* Tr. at 49. The September 2018 report indicates that Dickson Convenience received $66,061.30 in James River's cash fuel proceeds that month and had accumulated an outstanding balance of cash fuel proceeds due to James River of $109,197.44. October 5, 2018 Email to Mrs. Dickson, at 2; Tr. at 50; Pl. Ex. 5, at 35 (September 2018 James River Account Statement) (indicating that $12,942.00 was deposited into James River's Account). Mrs. Dickson testified that the amount of cash fuel proceeds listed as received by Dickson Convenience in the September 2018 consignment calculator report was accurate. Tr. at 50. According to Dickson Convenience's September 2018 Operating Account statement, total cash deposits of $17,215.00

---

[48] The June 2018 Profit and Loss Statement was admitted as Mrs. Dickson's Exhibit I. *See* Def. Ex. I.

were made that month. Pl. Ex. 17, Dickson Convenience September 2018 Profit and Loss

Statement and PNC Bank Statement (hereinafter, "September 2018 Profit and Loss Statement"),

at 9;[49] *see* Tr. at 53-54.

Dickson Convenience's failure to deposit all cash fuel proceeds into James River's

Account is explained, at least in part, by its use of cash fuel proceeds for Gas Station expenses.

When Dickson Convenience began operating the Gas Station, inventory orders were paid for using

checks drawn on the Operating Account. Tr. at 34; *see* Dep. at 109. However, after Dickson

Convenience had checks returned for insufficient funds in the spring or summer of 2018,[50] some

of its vendors required payments to be made either by money order or cash.[51] Tr. at 34-35; Dep. at

34-36, 109. Mrs. Dickson conceded that she deposited James River's cash into Dickson

Convenience's Operating Account to fund Dickson Convenience's operations, restock inventory,

and make payroll, then deposited the remainder into James River's Account. Tr. at 28-29, 33; Dep.

at 68; *see also* Dep. at 36-37, 72-73. Mrs. Dickson also allocated James River's cash fuel proceeds

for the Gas Station's upkeep from normal wear and tear and to make repairs, such as fixing a

---

[49] The September 2018 Profit and Loss Statement also appeared among Mrs. Dickson's trial exhibits as Exhibit L. *See* Def. Ex. L.

[50] In May 2018, Dickson Convenience received a loan of approximately $6,000.00 from Intuit Financing, which was repaid weekly. Dep. at 119; June 2018 Profit and Loss Statement, at 7-8, 13-14 (indicating payments to Intuit Financing of $241.68 per week). Dickson Convenience also obtained a loan between $6,000.00 and $7,000.00 from Yellowstone Capital (later known Green Capital), which balance could have been as much as $10,000.00 at one point according to Mrs. Dickson. Dep. at 117-18, 123-24. Dickson Convenience paid Yellowstone Capital $194.00 each day for its outstanding loan obligations. *Id.* at 118; *see* June 2018 Profit and Loss Statement, at 8, 14-15; Pl. Ex. 15, Dickson Convenience July 2018 Profit and Loss Statement and PNC Bank Statement (hereinafter, "July 2018 Profit and Loss Statement"), at 8, 12-14 (also tendered among Mrs. Dickson's exhibits as Exhibit J). Dickson Convenience repaid both loans. Dep. at 119-20.

[51] At her deposition, Mrs. Dickson testified that she used money orders to purchase goods from Atlantic Dominion, Pepsi, and a beer distributor. Dep. at 53, 142, 145.

broken ice machine, painting the building, repairing the roof and ceiling tiles, and maintaining the

parking lot. *See* Tr. at 36; Dep. at 79.

Mrs. Dickson also withdrew money from the Operating Account for wages for herself and

her family every month from October 2017 through February 2019 with the exception of two

months.[52] *See* Tr. at 22-23, 70-78 (discussing wages reflected on Dickson Convenience's profit

and loss statements for October 2017 through February 2019); *see also* Dep. at 109-10, 128-29.

Mrs. Dickson did not receive a set wage. Tr. at 19; Dep. at 23-24. Instead, she determined how

much to pay herself and her family based upon their living expenses and whether Dickson

Convenience had sufficient funds to pay them. *See* Tr. at 19-20, 22; Dep. at 28-29. Mrs. Dickson

paid herself via checks written on the Operating Account, which she deposited into a joint checking

account she shared with her husband to pay their personal expenses. Dep. at 29-30, 130. For

example, the December 2017 Profit and Loss Statement contains two $900.00 journal entries under

the "Salaries and Wages" category: one on December 11, 2017, and the other on December 21,

2017, which Mrs. Dickson testified represented wages for her and her family. *See* December 2017

Profit and Loss Statement, at 3; Tr. at 71. Likewise, the January 2018 Profit and Loss Statement

reflects five "Salaries and Wages" journal entries, ranging from $900.00 to $2,000.00, for a total

---

[52] Mrs. Dickson did not withdraw money in June 2018 from the Operating Account to pay her family's living expenses. Tr. at 74; Def. Ex. I, Dickson Convenience June 2018 Profit and Loss Statement (included as James River's Exhibit 14), at 5, 7. In addition, Mrs. Dickson did not withdraw money from the Operating Account in January 2019 to pay her and her husband wages but did pay her daughter, Makayla Dickson, via Dickson Convenience's payroll system. Tr. at 78; Def. Ex. P, Dickson Convenience January 2019 Profit and Loss Statement (also tendered among James River's exhibits as Exhibit 21) (hereinafter, "January 2019 Profit and Loss Statement"), at 6. Makayla Dickson was paid $270.00 by direct deposit on each of January 11, 2019, and on January 18, 2019. January 2019 Profit and Loss Statement, at 6.

of $6,600.00. *See* Pl. Ex. 9, Dickson Convenience January 2018 Profit and Loss Statement and

PNC Bank Statement (hereinafter, "January 2018 Profit and Loss Statement"), at 6;[53] Tr. at 71-72.

At trial, Mrs. Dickson testified that the decision to use James River's cash fuel proceeds

for Dickson Convenience's expenses was hers alone. Tr. at 30. Mrs. Dickson believed James River

"acquiesce[d]" regarding the use of its cash fuel proceeds in that "[t]hey would call every once in

a while" directing Dickson Convenience to deposit missing funds. *Id.* at 66; *see id.* at 59, 79, 81;

*see also id.* at 30 (testimony by Mrs. Dickson asserting that James River knew the cash fuel

proceeds were being used for store operations); Dep. at 99-100 (Mrs. Dickson recounting that she

received emails from James River requesting that cash be deposited but that "they would be few

and far in between," coming sometimes only every couple months).[54] In calculating the amount of

James River's cash fuel proceeds to deposit into the Operating Account, Mrs. Dickson reviewed

Dickson Convenience's "daily sales [reports] to determine what was gas and what was cash" and

then determined if she needed a portion of those funds to make payroll or purchase inventory.[55]

Tr. at 28-29, 31; *see also* Dep. at 37-38, 70. Mrs. Dickson would then calculate the portion of the

credit card sales she believed was Dickson Convenience's property and retain that amount of

James River's cash fuel proceeds. Tr. at 32-33. Any amount not necessary for Gas Station

operations was deposited into James River's Account. *Id.* at 29. Mrs. Dickson explained her

understanding of the contractual arrangement with James River with the following example: if

Dickson Convenience sold $100.00 in James River's fuel but had only $90.00 in credit card

---

[53] The January 2018 Profit and Loss Statement was admitted as Mrs. Dickson's Exhibit D. *See*
Def. Ex. D.

[54] Mrs. Dickson recounted that she received a letter from James River at one point indicating that
if she did not pay approximately $5,000.00, James River would initiate a criminal proceeding.
Tr. at 65.

[55] Dickson Convenience's Commander 2 register software generated the daily reports, which
provided the amount of credit card and cash fuel sales. Tr. at 31; Dep. at 37.

transactions, then Dickson Convenience would owe James River $10.00. Dep. at 70-71. On the other hand, if Dickson Convenience sold $100.00 in fuel and had $120.00 in credit card sales, then Dickson Convenience deposited less cash into James River's Account because "[James River] would owe [Dickson Convenience]" the difference. *Id.* at 71. According to Mrs. Dickson, Dickson Convenience's use of James River's cash fuel proceeds was not reflected in Dickson Convenience's profit and loss statements. *Id.* at 54-56.

### D.  The Closure of Dickson Convenience

Without sufficient funds to cover all its expenses, Dickson Convenience experienced monthly losses between $5,000.00 and $10,000.00. Dep. at 63-64, 104. Mrs. Dickson believed that Dickson Convenience was never profitable because it was unable to create a consistent customer base. Tr. at 15; Dep. at 63. In March 2019, after Dickson Convenience operated with losses for almost eighteen months, Mrs. Dickson received a letter from James River demanding payment of approximately $25,000.00 within five days. Dep. at 60-62, 64; *see* Tr. at 16, 65; *see also* Tr. at 78. Mrs. Dickson did not have funds to pay the demanded amount and instead sought legal advice, resulting in her decisions to close Dickson Convenience and file for bankruptcy. Dep. at 60-62. After the closure of Dickson Convenience, a new store operator took over the Gas Station. Tr. at 99. According to Ms. Hawthorne, the new store operator had the same contractual terms Dickson Convenience had with James River and was successfully operating the Gas Station. *Id.*

Mrs. Dickson conceded that Dickson Convenience used over $150,000.00 in James River's cash fuel proceeds to fund the Gas Station's operations. *Id*. at 33. At her deposition, she admitted that Dickson Convenience owed James River some amount of cash fuel proceeds and that it was a "possibility" James River was owed $171,000.00. Dep. at 63, 107. Throughout Dickson Convenience's operation, James River and Dickson Convenience never altered the terms of the

contracts, either verbally or in writing. Tr. at 58. In addition, Mrs. Dickson never challenged the total amount of cash due. Dep. at 95.

At trial, James River submitted its Account Reconciliation, which summarized the amounts owed by Dickson Convenience for fuel sales, pass-through operating expenses, rent, dealer operating expenses, and the note receivable, as well as credits for commissions and the amount of cash Dickson Convenience deposited into James River's Account during its corporate existence. *See* Tr. at 56. *See generally* Account Reconciliation. James River's Account Reconciliation sets forth a total of $171,575.11 in cash fuel proceeds that Dickson Convenience failed to turn over to James River. *See* Account Reconciliation, at 1, 16, 31-32.

Ms. Hawthorne testified that James River sought "the difference between the consigned fuel sales and the credit and cash receipt[s] [of fuel proceeds]" to be declared nondischargeable.[56] Tr. at 92; *see* Account Reconciliation, at 1, 16, 31-32. During the consignment relationship, Dickson Convenience sold $1,558,018.32 of consigned petroleum products. Account Reconciliation, at 1, 5-16. James River received credit card remittances of $1,261,452.05. *Id*. at 1, 17-31; *see* Tr. at 89, 93. Dickson Convenience made cash deposits into James River's Account totaling $124,991.16 while operating the Gas Station. Account Reconciliation, at 1, 32; Tr. at 89, 91. However, according to Ms. Hawthorne, the $171,575.11 set forth in the Complaint as the total amount due from Dickson Convenience included $12,135.80 for network processing fees that James River was obligated to pay and for which Dickson Convenience was entitled to credit pursuant to the terms of the Consignment Contract. Tr. at 94-95; Account Reconciliation, at 3 (totaling James River's share of the network processing fees); *see* Complaint, at prayer;

---

[56] At trial, James River, through Ms. Hawthorne's testimony, acknowledged that it was not seeking amounts due for rent and the note receivable because James River understood those amounts would be discharged in Mrs. Dickson's underlying bankruptcy case. Tr. at 87; *see also id.* at 88.

Consignment Contract, at paras. C(4)(e), C(8). As a result, James River reduced the amount sought

to be declared nondischargeable to $159,439.31. Tr. at 95.

### III.  CONCLUSIONS OF LAW

This Court has analyzed the considerations to be weighed when determining whether a debt

is nondischargeable under 11 U.S.C. § 523 in numerous cases.

> One of the most important benefits of the Bankruptcy Code is its ability to offer
> debtors a fresh start. This concept of a fresh start demands that courts construe
> exceptions to discharge narrowly against the objecting creditor and in favor of the
> debtor. *Gleason v. Thaw*, 236 U.S. 558, 561-62 (1915); *Foley & Lardner v. Biondo*
> (*In re Biondo*), 180 F.3d 126, 130 (4th Cir. 1999) (citing *Century 21 Balfour Real
> Estate v. Menna* (*In re Menna*), 16 F.3d 7, 9 (1st Cir. 1994)); *Rezin v. Barr* (*In re
> Barr*), 194 B.R. 1009, 1016 (Bankr. N.D. Ill. 1996) (citing *Mayer v. Spanel Int'l
> Ltd.*, 51 F.3d 670, 674 (7th Cir. 1995)). Courts balance this belief in a fresh start
> with the principle that "perpetrators of fraud are not allowed to hide behind the
> skirts of the Bankruptcy Code." *In re Biondo*, 180 F.3d at 130 (citing *Cohen v. de
> la Cruz*, 523 U.S. 213, 217 (1998)).

*Commercial Cash Flow, L.L.C. v. Matkins* (*In re Matkins*), 605 B.R. 62, 84-85 (Bankr. E.D. Va.

2019) (quoting *McCoy v. McCoy* (*In re McCoy*), Adv. Proc. No. 15-07042-SCS, 2016 WL

4268702, at *8 (Bankr. E.D. Va. Aug. 11, 2016)); *see also Miller v. Liatos* (*In re Liatos*), Adv.

Proc. No. 11-07052-SCS, 2012 WL 3260350, at *5 (Bankr. E.D. Va. Aug. 8, 2012); *Dominion Va.

Power v. Robinson* (*In re Robinson*), 340 B.R. 316, 328-29 (Bankr. E.D. Va. 2006); *Elrod v.

Bowden* (*In re Bowden*), 326 B.R. 62, 81 (Bankr. E.D. Va. 2005).

An objection to dischargeability pursuant to Section 523(a) requires the plaintiff to carry

the burden of proof and prove the nondischargeability of a debt by a preponderance of the

evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Farouki v. Emirates Bank Int'l, Ltd.*, 14

F.3d 244, 249 n.17 (4th Cir. 1994); *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir. 1988); *In re

Matkins*, 605 B.R. at 85. Therefore, James River must prove by preponderance of the evidence that

the debt owed to it by Mrs. Dickson is nondischargeable under 11 U.S.C. § 523(a)(4) and/or § 523(a)(6).

### A.  Validity of and Liability Under the Lease Agreement, Consignment Contract, and Guaranty Agreement

As a preliminary matter, the Court will address whether a contract was formed between James River and Dickson Convenience pursuant to the Lease Agreement and Consignment Contract. At trial, Mrs. Dickson admitted that she signed both the Lease Agreement and Consignment Contract voluntarily on behalf of Dickson Convenience. Tr. at 16-17. Neither document was subsequently altered, either verbally or in writing. *Id.* at 58. Further, it is undisputed that Mrs. Dickson individually guaranteed the obligations of Dickson Convenience under both the Lease Agreement and the Consignment Contract, as evidenced by her signature on the Guaranty Agreement. *Id.* at 18-19. Therefore, the Court finds that legally binding agreements existed between James River and Dickson Convenience pursuant to the Lease Agreement and the Consignment Contract and between James River and Mrs. Dickson pursuant to the Guaranty Agreement. Therefore, the Court finds that if Dickson Convenience failed to fulfill its contractual obligations under the Lease Agreement and/or the Consignment Contract, Mrs. Dickson is individually liable for the damages resulting from those failures if those actions are attributable to Mrs. Dickson. *See Airlines Reporting Corp. v. Ellison* (*In re Ellison*), 296 F.3d 266, 270-71 (4th Cir. 2002).

### B.  § 523(a)(4): Fraud or Defalcation While Acting in a Fiduciary Capacity

James River seeks the determination of the dischargeability of debt related to Dickson Convenience's failure to deposit cash fuel proceeds pursuant to the Consignment Contract under Section 523(a)(4). Section 523(a)(4) provides that debts arising from fraud or defalcation while a debtor acted in a fiduciary capacity, embezzlement, or larceny are excepted from discharge. 11

U.S.C. § 523(a)(4). A successful claim under § 523(a)(4) requires a creditor to prove both that "the

debt . . . arose while the debtor was acting in a fiduciary capacity[,] and . . . that the debt arose

from the debtor's fraud or defalcation." *Kubota Tractor Corp. v. Strack* (*In re Strack*), 524 F.3d

493, 497 (4th Cir. 2008) (citing *Pahlavi v. Ansari* (*In re Ansari*), 113 F.3d 17, 20 (4th Cir. 1997));

*see also Larsen v. Larsen* (*In re Larsen*), Adv. Proc. No. 1-16-01116-NHL, 2018 WL 4006935, at

*6 (Bankr. E.D.N.Y. Aug. 17, 2018) ("[Section] 523(a)(4) requires that the debt be 'for,' or arise

out of, defalcation such that there is a causal relationship between the act constituting defalcation

and the debt in question.").

### 1.   Whether Dickson Convenience Owed a Fiduciary Duty to James River

The Court's analysis begins with a determination of whether the debt arose while the debtor

was acting in a fiduciary capacity. *In re Strack*, 524 F.3d at 497. "The fiduciaries contemplated

under 11 U.S.C. § 523(a)(4) are 'persons in positions of ultimate trust,' including 'public officers,

executors, administrators, guardians, trustees of express trusts, attorneys, and corporate

directors.'" *Webb v. Isaacson* (*In re Isaacson*), 478 B.R. 763, 779 (Bankr. E.D. Va. 2012) (citing

*Spinoso v. Heilman* (*In re Heilman*), 241 B.R. 137, 169-70 (Bankr. D. Md. 1999)). Without more,

a contractual relationship alone does not establish a fiduciary relationship. *Id*. at 780-81. A contract

that creates an express or technical trust may, however, create the requisite fiduciary relationship.

*In re Strack*, 524 F.3d at 498 (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 334 (1934))

("[T]he creation of an express trust can give rise to the requisite fiduciary duty under Section

523(a)(4)."); *Harrell v. Merch.'s Express Money Order Co.* (*In re Harrell*), No. 98-1728, 1999

WL 150278, at *3 (4th Cir. Mar. 19, 1999) (citing *Miller v. J.D. Abrams, Inc.* (*In re Miller*), 156

F.3d 598, 602 (5th Cir. 1998)) ("Under [Section 523(a)(4)], a fiduciary is limited to instances

involving express or technical trusts.").

Generally, the law of the state where the trust was allegedly created determines whether a trust was established. *Am. Bankers Ins. Co. of Fla. v. Maness*, 101 F.3d 358, 363 (4th Cir. 1996) ("[W]hile federal law creates the bankruptcy estate, . . . state law, absent a countervailing federal interest, determines whether a given property falls within this federal framework."). Where an agreement includes a choice of law provision, however, those provisions are presumptively valid and applied, barring evidence of fraud, inconvenience, deprivation of a remedy, or contravention of strong public policy of the forum state. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 594-96 (1991); *Albemarle Corp. v. AstraZeneca UK LTD*, 628 F.3d 643, 651 (4th Cir. 2010) (quoting *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996)); *Direct Capital Grp. v. Hadley* (*In re Hadley*), Adv. Proc. No. 09-07141-FJS, 2011 WL 3664609, at *8 (Bankr. E.D. Va. Aug. 19, 2011). It is undisputed that the Gas Station is located in North Carolina and that Dickson Convenience was a North Carolina limited liability corporation. Partial Stipulation, at paras. 2, 6. In addition, Mrs. Dickson executed the Lease Agreement, Consignment Contract, and Guaranty Agreement at the Gas Station. Tr. at 16. However, the parties agreed that the laws of the Commonwealth of Virginia would govern in the event of a proceeding related to or arising under any of the three documents. Lease Agreement, at § 22.10; Consignment Contract, at preamble, para. R; Guaranty Agreement, at para. 12. No evidence suggests, nor did either party assert, that the Court should disregard the contractual choice of law provision. Accordingly, the Court will apply the law of the Commonwealth of Virginia to determine if an express or technical indeed existed.

When considering whether an express trust is created under Virginia law, the presence of the word "trust" in a written agreement is not necessary but is afforded great weight in determining a trust's existence. *In re Strack*, 524 F.3d at 498 (citing *Broaddus v. Gresham*, 181 Va. 725, 732

(1943); *Exec. Comm. v. Shaver*, 146 Va. 73, 79 (1926)). Rather, the Court must examine the

parties' intentions as expressed in writing or through their actions. *Id*. at 498-99. As the *Strack*

Court held,

> All that is necessary is the "unequivocal" intent "'that the legal estate [be] vested
> in one person, to be held in some manner or for some purpose on behalf of
> another.'" At bottom, "[i]f the intention is that the money shall be kept or used as a
> separate fund for the benefit of the payor or a third person, a trust is created. If[,
> however,] the intention is that the person receiving the money shall have the
> unrestricted use thereof, being liable to pay a similar amount whether with or
> without interest to the payor or to a third person, a debt is created."

*In re Strack*, 524 F.3d at 499 (quoting *Old Republic Nat'l Title Ins. Co.* (*In re Dameron*)*,* 155 F.3d

718, 722 (4th Cir. 1998); *Broaddus*, 181 Va. at 732).

Judge Ellis has summarized the application of Virginia law by the Fourth Circuit Court of

Appeals in *Strack* when determining if an express trust was created:

> [T]he *Strack* opinion identifies three primary indicia of an intent to create an
> express trust rather than a mere debt. They are: (i) the designated trustee lacks legal
> title to the property at issue; (ii) the trustee is restricted in his use of the property;
> and (iii) the property remains separate from the trustee's own property.

*Racetrac Petroleum, Inc. v. Khan* (*In re Khan*), 461 B.R. 343, 348 (E.D. Va. 2011) (hereinafter,

"*Racetrac Petroleum*") (citing *In re Strack*, 524 F.3d at 499); *see also Broaddus*, 181 Va. at 732.

Employing the guidance from *Strack*, as discussed in *Racetrac Petroleum*, the Court must consider

the following: (1) whether James River held legal title to the cash fuel proceeds; (2) whether

Dickson Convenience was restricted in its use of the cash fuel proceeds; and (3) whether Dickson

Convenience was required to separately maintain the cash fuel proceeds. The facts unquestionably

establish that all three indicia are met in the instant matter.[57]

---

[57] Even if the laws of the state of North Carolina were applied, the Court would still find that a
trust was created and the requisite fiduciary relationship was established. As summarized by
Judge Whitley, the following elements must be present for a trust to exist under North Carolina
law: "(1) an identifiable trust res, (2) specific fiduciary duties, and (3) its existence prior to and

The Consignment Contract plainly sets forth that James River retained title not only to the petroleum products it delivered to the Gas Station but also to all proceeds from their sale. Consignment Contract, at paras. B(2)(a)-(b), C(5)(a). Mrs. Dickson acknowledged these aspects of Dickson Convenience's agreement with James River. *See* Tr. at 31, 59. The extent of James River's control over the petroleum products even after delivery to Dickson Convenience is further evidenced by James River's control over the retail price of the products. Consignment Contract, at para. C(1).

The Consignment Contract restricted Dickson Convenience's use of the cash fuel proceeds by requiring those proceeds to be deposited daily into James River's Account. *See id.* at paras. B(2)(b), C(5)(a); Partial Stipulation, at para. 9; *see also In re Matkins*, 605 B.R. at 101-02 (finding that the duty to immediately make invoice proceeds available to the proceeds' owner evidenced a restriction on the proceeds' use by the recipient).[58] Failure to do so triggered the assessment of a daily ten percent late fee; if the failure was the result of an intentional act or omission, such constituted the "unauthorized retention" of James River's property. Consignment Contract, at paras. C(5)(a)-(b). The use restrictions are additionally demonstrated by the clear prohibition

---

without reference to the act creating the debt." *Hasalia v. Walker* (*In re Walker*), 416 B.R. 449, 466 (Bankr. W.D.N.C. 2009) (citing *KGB Int'l, Inc. v. Watford* (*In re Watford*), 374 B.R. 184, 190 (Bankr. M.D.N.C. 2007)); *see also Burns v. Creech* (*In re Creech*), 350 B.R. 24, 27 (Bankr. M.D.N.C. 2006). Here, the trust res was the identifiable cash fuel proceeds in which James River retained ownership. *See* Partial Stipulation, at para. 9. Dickson Convenience was required by the terms of the Consignment Contract to deposit those cash proceeds daily into James River's Account. *See id*. The parties entered into the Consignment Contract prior to any failure by Dickson Convenience to deposit the cash fuel proceeds. *See id*. at para. 7. *See generally* Account Reconciliation. Accordingly, if analyzed under North Carolina law, the Court would likewise conclude that a trust and the associated fiduciary duties existed here.

[58] Proceeds from fuel sales paid for by credit card were automatically transferred to James River. *See* Consignment Contract, at paras. C(4)(d), C(5)(a).

against Dickson Convenience withholding, retaining, borrowing, offsetting, crediting, or otherwise taking any of the cash fuel proceeds. *Id*. at para. C(5)(b).

The Consignment Contract does not specifically require that Dickson Convenience maintain the cash fuel proceeds separate from its own cash. Notwithstanding the lack of such mandate, that Dickson Convenience was required to deposit the proceeds daily into James River's Account implies that the funds would be intermingled with its own cash for only as long as needed to determine the amount of cash fuel sales and thus the amount of cash to deposit each day. *See* Consignment Contract, at para. C(5)(a). As noted by Judge Ellis, "segregation [of funds] into different bank accounts is not the *sine qua non* of separate funds; rather, it is sufficient if the parties intend the funds . . . to be maintained separately in terms of accounting and use." *Racetrac Petroleum*, 461 B.R. at 350. Thus, even where funds are commingled, an express trust may still exist if the funds at issue are traceable and identifiable. *See id*. at 349-50. Such capabilities existed here by virtue of the POS System, which tracked the sales of and sources of payment for petroleum products both at the gas pumps as well and the Gas Station's cash registers. *See* Consignment Contract, at para. C(4)(d); Dep. at 37-38; *see also* Tr. at 31, 85. Thus, like in *Racetrac Petroleum*, the POS System enabled the parties to easily identify and trace the amount of cash proceeds from fuel sales. *See Racetrac Petroleum*, 461 B.R. at 349.

The relationship between the parties here bears striking similarity to those in *Strack*, *Racetrac Petroleum*, and numerous cases relying on them, including this Court's own decision in *In re Matkins*. The evidence here unequivocally demonstrates that the parties intended to create an express trust. James River retained title to the petroleum products and the proceeds from the sales thereof. Dickson Convenience was not permitted to utilize the proceeds in any manner but instead was required to deposit the identifiable, traceable proceeds into James River's Account on a daily

46

basis. Accordingly, the Court concludes that the Consignment Contract gave rise to an express

trust, which placed upon Dickson Convenience the attendant fiduciary duties. Thus, the Court must

next determine whether Dickson Convenience committed fiduciary defalcation.

2.   Whether Dickson Convenience Committed Fiduciary Defalcation

Having concluded that an express trust and resulting fiduciary relationship existed between

James River and Dickson Convenience, the Court must determine whether Dickson Convenience

committed fiduciary defalcation. This Court recently discussed the mental state required for a

finding of defalcation as outlined in *Bullock v. BankChampaign*, 569 U.S. 267 (2013).

> In *Bullock*, the Supreme Court described the required state of mind as "involving
> knowledge of, or gross recklessness in respect to, the improper nature of the
> relevant fiduciary behavior." [*Bullock v. BankChampaign*, 569 U.S. 267, 269
> (2013)]. The Court further expounded that when "the conduct at issue does not
> involve bad faith, moral turpitude, or other immoral conduct," defalcation requires
> a showing that the fiduciary "'consciously disregard[ed]' (or [was] willfully blind
> to) 'a substantial and unjustifiable risk' that his conduct [would] . . . violate a
> fiduciary duty.'" *Id.* at 274 (quoting Model Penal Code § 2.02(2)(c) (Am. Law Inst.
> 1985)). Therefore, if the fraudulent conduct does not involve bad faith, moral
> turpitude, or other immoral conduct, then the conduct must involve an "intentional
> wrong," which includes "not only conduct that the fiduciary knows is improper but
> also reckless conduct." *Id.* The defendant's state of mind is therefore crucial to
> resolving a § 523(a)(4) cause of action. Whether the culpable state of mind existed
> depends on the facts and circumstances of the case, such that the Court must infer
> the debtor's intention. *Chavis v. Mangrum* (*In re Mangrum*), 599 B.R. 868, 876
> (Bankr. E.D. Va. 2019); *MacArthur Co. v. Cupit* (*In re Cupit*), 514 B.R. 42, 51
> (Bankr. D. Col. 2014). A corporation's mental state is revealed though the beliefs
> and actions of its officers and agents. *N.Y. Cent. & Hudson River R.R. Co. v. United
> States*, 212 U.S. 481, 492-93 (1909) ("Since a corporation acts by its officers and
> agents, their purposes, motives, and intent are just as much those of the corporation
> as are the things done.").

*In re Matkins*, 605 B.R. at 103 (footnote omitted).[59] Mrs. Dickson was Dickson Convenience's

sole owner and manager, as well as Dickson Convenience's signatory on the Lease Agreement and

---

[59] As this Court has noted, "[p]rior to *Bullock*, the state of mind required to prove defalcation
was relatively low. '[N]egligence or even an innocent mistake which results in misappropriation

Consignment Contract. In addition, she alone determined the disposition of the cash fuel proceeds. *See, e.g.*, Tr. at 28-33 (Mrs. Dickson describing how she calculated the amount of cash fuel proceeds to retain for Dickson Convenience's expenses and the amount to deposit into James River's Account). Therefore, Mrs. Dickson's state of mind is a paramount consideration when determining whether Dickson Convenience violated its fiduciary duty to James River.

James River did not allege in its Complaint that the conduct in question involves bad faith, moral turpitude, or other immoral conduct in the context of its allegations under Section 523(a)(4).[60] Rather, James River alleges the defalcation here resulted from the intentional failure to deposit the cash fuel proceeds. The Court must decide, as a threshold issue, whether Dickson Convenience, through Mrs. Dickson, was subjectively aware of its fiduciary duties to James River, as required for a finding that either a conscious disregard of or willful blindness to a substantial and unjustifiable risk of violating those duties occurred. *See In re Matkins*, 605 B.R. at 104 (citing *In re Mangrum*, 599 B.R. at 877). James River cannot meet its burden by merely "show[ing] that the debtor should have known of the fiduciary duties." *Id.* (citing *In re Cupit*, 514 B.R. at 53). "Rather, the Court must examine the characteristics of the particular debtor, including whether the agreement to serve as a fiduciary was entered into voluntarily as well as the debtor's knowledge

---

or failure to account' adequately proved defalcation." *In re Matkins*, 605 B.R. at 103 n.46 (quoting *Rwanda v. Uwimana* (*In re Uwimana*), 274 F.3d 806, 811 (4th Cir. 2001)).

[60] Counsel for James River did assert during his closing argument that Mrs. Dickson's conduct constituted either bad faith, moral turpitude, or other immoral conduct. Tr. at 118. While Dickson Convenience's failure to deposit the cash fuel proceeds into James River's Account could give rise to a finding of bad faith, moral turpitude, or other immoral conduct associated with embezzlement, the Court need not make such determination. As explained herein, Dickson Convenience, by Mrs. Dickson's actions, consciously disregarded a substantial and unjustifiable risk that failing to deposit the cash fuel proceeds into James River's Account would violate its fiduciary duties under the Consignment Contract.

and sophistication, in determining subjective awareness." *Id.* (citing *In re Mangrum*, 599 B.R. at 878; *Caitlin Energy, Inc. v. Rachel* (*In re Rachel*), 527 B.R. 529, 543 (Bankr. N.D. Ga. 2015)).

If James River proves by a preponderance of the evidence that Dickson Convenience was subjectively aware of its fiduciary duty, the Court must then analyze whether Dickson Convenience's failure to deposit the cash fuel proceeds into James River's Account resulted from a conscious disregard of or willful blindness to the risk of violating its fiduciary duty when doing so. *Bullock*, 569 U.S. at 274. As the Supreme Court has held, conscious disregard or willful blindness equates to actual knowledge of wrongdoing. *Id.* (citing Model Penal Code § 2.02(2)(c) (Am. Law Inst. 1985)). Conscious disregard, which can be inferred and need not be admitted by the debtor, requires proof "that the debtor was aware of the fiduciary duty and of the risk that his conduct would violate that duty." *In re Cupit*, 514 B.R. at 51 (citing *People v. Hall*, 999 P.2d 207, 220 (Colo. 2000)). "A debtor cannot *consciously* disregard a risk of violating a fiduciary duty if he or she is wholly unaware of the duty." *Id*. Therefore, conscious disregard is proven by evidence that "the debtor was subjectively aware that his conduct *might* result in a breach of that fiduciary duty." *In re Mangrum*, 599 B.R. at 877 (citing *In re Rachel*, 527 B.R. at 543). Willful blindness requires a two-part showing, as announced by the Supreme Court: "(1) [t]he defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). "The debtor thus must make a purposeful decision to avoid ascertaining the existence of a fact he believes has a high probability of existence. The 'willful blindness'

requirement therefore requires a higher subjective standard of awareness." *In re Matkins*, 605 B.R. at 104 (citing *In re Mangrum*, 599 B.R. at 877; *In re Cupit*, 514 B.R. at 52).[61]

In *Bullock*, the Supreme Court also concluded that if the debtor consciously disregarded or was willfully blind to the risk of violating the attendant fiduciary duties, then the risk of doing so must be "substantial and unjustifiable." *Bullock*, 569 U.S. at 274. As summarized in the *Matkins* decision:

> The Court must assess both the likelihood and the magnitude of the harm that may occur from the debtor's conduct to determine if the risk is substantial. *In re Cupit*, 514 B.R. at 52 (quoting *People v. Hall*, 999 P.2d 207, 218 (Colo. 2000)). The "unjustifiable" condition requires the Court to explore "'the nature and purpose of the actor's conduct relative to how substantial the risk is.'" *Id.* (quoting *Hall*, 999 P.2d at 218). The "substantial and unjustifiable" inquiry must show a disregard that is a "gross deviation" from the conduct that a "law-abiding person" facing the same situation as that presented to the debtor would undertake. *Bullock*, 569 U.S. at 274 (citing Model Penal Code § 2.02(2) (Am. Law Inst. 1985)); *see also In re Mangrum*, 599 B.R. at 877 (citing *Larsen v. Larsen* (*In re Larsen*), Adv. No. 1-16-01116-NHL, 2018 WL 4006935, at *7 (Bankr. E.D.N.Y. Aug. 17, 2018)) (finding that the debtor is provided a "safe harbor" if the "law-abiding person" would have pursued the same conduct under the circumstances and in light of the risk of violating the fiduciary duty).

*In re Matkins*, 605 B.R. at 105.

The Court concludes that James River has proven by a preponderance of the evidence that Mrs. Dickson, and, consequently, Dickson Convenience, was subjectively aware of the fiduciary duties imposed by the Consignment Contract. Mrs. Dickson is a high school graduate who extended her education with approximately one year of college courses. Tr. at 60. She has extensive work experience in both restaurants and the convenience store industry, working in the

---

[61] Willful blindness is distinguished from reckless indifference in that a reckless defendant "merely knows of a substantial and unjustified risk of such wrongdoing." *Glob.-Tech Appliances, Inc.*, 563 U.S. at 770. Because willful blindness involves the defendant deliberately avoiding confirmation of a high probability of wrongdoing, its requirements are "limited [in] scope [and] surpass recklessness and negligence." *Id.* at 769.

latter for approximately seven years before forming Dickson Convenience and undertaking operations at the Gas Station. *See id*. at 10-11; Dep. at 8-10. Her experience included serving as the sole manager for the prior Gas Station operator, who, by Mrs. Dickson's testimony, was rarely on location. Tr. at 12. At no point did Mrs. Dickson offer any testimony or evidence that she had difficulty understanding or performing her job duties as the sole manager for the prior station operator. When contemplating James River's initial offer to operate the Gas Station, she weighed the financial feasibility of doing so as it related to licensure requirements and inventory expenses. *Id*. at 62; *see* Dep. at 15-16, 81. Mrs. Dickson later accepted James River's second offer to operate the Gas Station, which included financial assistance from James River to stock inventory and purchase new equipment. Tr. at 62; Dep. at 16.

James River provided three documents—the Lease Agreement, the Consignment Contract, and the Guaranty Agreement—to Mrs. Dickson via email. *See* Tr. at 16-18, 60-61. She reviewed the documents for approximately one day before voluntarily signing them. *See id*. at 16-19, 60-61. Mrs. Dickson indicated neither the circumstances that caused her to take only one day to review the contracts nor why she did not consult an attorney. *See id*. at 60. The latter point is underscored by explicit language of Paragraph L of the Consignment Contract: "[E]ach party has selected, or had an opportunity to select, legal counsel, such selection or non-selection was of their own free will, and each party had the opportunity to discuss the terms of this Consignment with their legal counsel." Consignment Contract, at para. L. Further, Mrs. Dickson has not refuted that the terms of the Consignment Contract were "fair and mutually satisfactory" and its "provisions [were] reasonable." *Id*. at para. J. Those provisions include the clear and unmistakable fiduciary duty regarding the proceeds from all petroleum product sales by Dickson Convenience: "[Dickson Convenience] shall fully cooperate with [James River] to cause all daily payments and proceeds

from the sale of [petroleum] [p]roducts at the [Gas Station], whether by cash, credit card, or otherwise . . . to be directed and deposited into [James River]'s designated bank account each day . . . ." *Id*. at para. C(5)(a). Mrs. Dickson acknowledged on multiple occasions that Dickson Convenience was required to deposit daily the cash fuel proceeds into James River's Account and that those proceeds were the property of James River. *See, e.g.*, Tr. at 29, 31, 59; Dep. at 67. She further testified that she did not recall any instructions to refrain from depositing cash fuel proceeds into James River's bank account. Tr. at 58, 80-81.

To be sure, Mrs. Dickson testified that she did not understand some of the information contained on the consignment calculator reports sent to her by James River, and her requests to James River for explanations regarding a portion of the content of those reports were apparently unheeded. *Id*. at 43; Dep. at 69-70, 91, 95. *But see* Dep. at 83-85 (testifying that she understood amounts set forth on the consignment calculator reports regarding the amounts of fuel and groceries sold). Further, Dickson Convenience's internal accounting records revealed multiple flaws, likely resulting from Mrs. Dickson's relative inexperience with the QuickBooks accounting software. *See* Tr. at 20-21. However, such testimony and revelations do not negate the fact that she, as Dickson Convenience's sole manager and principal, understood the core component from which Dickson Convenience's fiduciary duty to James River arose—to deposit the cash fuel proceeds into James River's Account on a daily basis.

Mrs. Dickson's comprehension of Dickson Convenience's fiduciary duty is further borne out by her actions of regularly making deposits into James River's Account as reflected on the related bank statements. *See generally* Pl. Ex. 5 (BB&T Statements for James River's Account dated November 2017 through May 2019). Thus, despite testifying that her immediate prior experience as Gas Station manager did not prepare her for operating the business in terms of

preparing a budget and ensuring adequate inventory, the Court finds that Mrs. Dickson was sufficiently sophisticated, as evinced not only by her background but by her experience and ensuing actions, to comprehend the fiduciary duty placed upon Dickson Convenience by the Consignment Contract to deposit the proceeds of cash fuel sales into James River's Account. *See* Consignment Contract, at para. C(5)(a); *see* Tr. at 62. Therefore, the Court concludes that Dickson Convenience, through Mrs. Dickson, was subjectively aware of its fiduciary duty.

The Court now turns to whether the failure of Dickson Convenience to deposit the cash fuel proceeds into James River's Account resulted from a conscious disregard of or willful blindness to the risk of violating its fiduciary duty. The record before the Court is replete with evidence that Dickson Convenience, through Mrs. Dickson, consciously disregarded the risk of violating its fiduciary duty to deposit cash fuel proceeds into James River's Account on a daily basis. *See* March 8, 2018 Email to Mrs. Dickson, at 2 (February 2018 consignment calculator report); May 4, 2018 Email to Mrs. Dickson (April 2018 consignment calculator report); June 6, 2018 Email to Mrs. Dickson (May 2018 consignment calculator report); July 6, 2018 Email to Mrs. Dickson (June 2018 consignment calculator report); October 5, 2018 Email to Mrs. Dickson (September 2018 consignment calculator report). *See generally* Account Reconciliation; Pl. Ex. 5, James River Petroleum, Inc., BB&T Statements dated November 2017 through May 2019. Further and equally compelling is Mrs. Dickson's testimony in this regard. Mrs. Dickson confessed that James River's cash fuel proceeds were intentionally used to sustain Dickson Convenience's operations, including purchasing inventory, maintaining the Gas Station, and making payroll. *See* Tr. at 28-29, 33, 36; Dep. at 36-37, 68, 72-73, 79. Payroll expenses included wages for herself and her family members that worked at the Gas Station, the amounts for which depended upon the family's monthly living expenses and Dickson Convenience's ability to pay. *See* Tr. at 19-20, 22;

Dep. at 28-29. On a daily basis, Mrs. Dickson made the decision to deposit any remaining cash unnecessary for Dickson Convenience's operations into James River's Account without regard for the true amount of cash attributable to fuel sales. Tr. at 29; Dep. at 36-37. In so doing, Mrs. Dickson undeniably prioritized Dickson Convenience's financial position over its contractual obligations. Therefore, the Court finds that Mrs. Dickson caused Dickson Convenience to consciously disregard the risk of violating its known fiduciary duty owed to James River. The Court thus need not determine whether Dickson Convenience was willfully blind to the risk of violating its fiduciary duty.

Finally, the Court must decide if James River has proven by a preponderance of the evidence that the risk of violating the fiduciary duty was substantial and unjustifiable. The substantiality aspect is viewed through lenses of both the likelihood and magnitude of harm that may have resulted from Dickson Convenience's failure to fulfill its fiduciary duty. James River has sufficiently proven that both facets are present here. The likelihood of harm to James River as a result of Dickson Convenience's failure to deposit cash fuel proceeds into James River's Account was unquestionably high, given that the fiduciary duty to do so fell squarely to Dickson Convenience. Economic harm was certain to befall James River if Dickson Convenience failed to deposit the total amount of cash fuel sales proceeds into James River's Account. Correspondingly, the magnitude of the harm was significant, particularly as the balance due to James River grew. While James River had the ability to see daily cash fuel sales, the cash that was to be deposited into its account under the Consignment Contract was purely under the control of Dickson Convenience.

James River has also proven that Dickson Convenience's conduct, through Mrs. Dickson, was not justifiable on any level in light of the nature and purpose of Mrs. Dickson's conduct as the

same relates to the substantiality of the risk. Mrs. Dickson attempted to rationalize her conduct by citing insufficient inventory levels, lack of a customer base, and the failure of James River to uphold its promise to financially assist Dickson Convenience in operating the Gas Station. *See, e.g.*, Tr. at 15, 68-69; October 5, 2017 Email Exchange, at 1-2 (raising concerns regarding lack of funds to purchase inventory, leading to lost sales and insufficient funds after paying payroll and rent); November 26-27, 2017 Email Exchange, at 2 (discussing insufficient cash flow and inability to fund payroll expenses). Mrs. Dickson further believed that she and James River's Vice-President of Operations, Mr. Natvig, had a mutual understanding that she could use James River's cash fuel proceeds to fund store operations. Dep. at 103, 105-06 (discussing the November 26-27, 2017 Email Exchange and concurrent conversations); *see also* Tr. at 30-31 (testifying that James River knew the cash fuel proceeds were being used for operating costs); Dep. at 106 (same). She further opined that James River acquiesced to her use of the funds. *See, e.g.*, Tr. at 79. These explanations, however, fall far short of justifying her conduct and the use of the cash fuel proceeds for Dickson Convenience's expenses. Similar to the Court's finding in *Matkins*, Mrs. Dickson also unquestionably acted only in the interest of Dickson Convenience. *In re Matkins*, 605 B.R. at 107. As the Court noted concerning Mr. Matkins's conduct and the resulting fiduciary defalcation on behalf of his company, "[w]hile desiring to pay one's employees is noble as it relates to those employees' well-being, such nobility of action does not obviate the unjustifiable nature of [the debtor]'s conduct here. The same can be said for [the debtor]'s attempts to maintain his pipeline of materials from other creditors by paying them." *Id*. In the instant case, James River's cash fuel proceeds were used to fund Dickson Convenience's operations, purchase inventory, maintain the Gas Station premises, and to pay payroll not only for the store's two employees but also for Mrs.

Dickson and her family. While there may be a limited amount of virtue in these actions, the conduct

here cannot be countenanced as justifiable.

On the whole, Mrs. Dickson's conduct that caused Dickson Convenience to consciously

disregard the risk of violating its fiduciary duty to James River represents "'*a gross deviation* from

the standard of conduct that a law-abiding person would observe[.]'" *Bullock*, 569 U.S. at 274

(quoting Model Penal Code § 2.02(2)(c) (Am. Law Inst. 1985)). Repeatedly, and seemingly daily,

despite having full awareness of the requirement to deposit the cash fuel proceeds into James

River's Account, Mrs. Dickson consciously disregarded Dickson Convenience's fiduciary duty

with respect to James River's property and instead utilized the cash fuel proceeds to financially

buoy Dickson Convenience. Tr. at 32-33. The risk that her actions would violate Dickson

Convenience's fiduciary duty was substantial and unjustifiable. This Court earlier summarized a

similar instance of fiduciary defalcation exhibited in *MacArthur Co. v. Cupit* (*In re Cupit*), 514

B.R. 42 (Bankr. D. Colo. 2014):

> In [*In re Cupit*], the debtor testified that he misdirected funds belonging to the
> creditor to improve his company's poor financial condition and to pay material
> suppliers. The Court noted that, in the context of defalcation, the risk would be
> justified if there were some possible interest or benefit to the trust beneficiary that
> outweighed misuse of the trust funds. However, the debtor used the funds to
> improve his company's position, not the trust beneficiary's position; thus, the Court
> found that "[s]uch a self-serving interest [could] not justify a risk of harm to the
> [trust beneficiary]."

*In re Matkins*, 605 B.R. at 107 (quoting *In re Cupit*, 514 B.R. at 52-53). As in both *Matkins* and

*Cupit*, no commensurate benefit to James River resulted from Dickson Convenience's use of James

River's cash fuel proceeds. As such, the Court finds that Dickson Convenience's conscious

disregard of the risk of violating its fiduciary duty to James River was both substantial and

unjustifiable. Therefore, the Court concludes as a matter of law that James River has met its burden

to prove by a preponderance of the evidence that Dickson Convenience committed fiduciary

defalcation under Section 523(a)(4).

### 3.  Mrs. Dickson's Defenses Raised at Trial

While not asserted in her answer to the Complaint, in his closing argument, counsel for

Mrs. Dickson urged the Court to consider several defenses to James River's allegations. First, Mrs.

Dickson's counsel asserts that James River "convinced" Mrs. Dickson to enter into the Lease

Agreement, Consignment Contract, and Guaranty Agreement and caused her to become

"indentured" to James River. Tr. at 128, 132. The Court will construe counsel's contentions as

asserting that the Consignment Contract is unconscionable by its terms and that Mrs. Dickson

entered into the contract as a result of duress.

The Fourth Circuit Court of Appeals has summarized unconscionability under Virginia law

as follows:

> Traditionally, for a contract to be unconscionable, it must have been "such as no
> man in his senses and not under delusion would make on the one hand, and as no
> honest and fair man would accept on the other." In other words, "[t]he inequality
> must be so gross as to shock the conscience."
>     Unconscionability has both a substantive and procedural element. The
> former requires a "gross disparity in the value exchanged." The latter necessitates
> inequity and bad faith in "the accompanying incidents . . . , such as concealments,
> misrepresentations, undue advantage, oppressions on the part of the one who
> obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity,
> pecuniary necessities, and the like."

*Lee v. Fairfax Cnty. Sch. Bd.*, 621 F. App'x 761, 762-63 (4th Cir. 2015) (alteration in original)

(quoting *Chaplain v. Chaplain*, 54 Va. App. 762, 773-74 (Va. Ct. App. 2009)). Allegations that a

contract is unenforceable due to unconscionability must be proven by clear and convincing

evidence. *Fransmart, LLC v. Freshii Dev., LLC*, 768 F. Supp. 2d 851, 871 (E.D. Va. 2011) (citing

*Pelfrey v. Pelfrey*, 25 Va. App. 239, 244 (Va. Ct. App. 1997)). It is insufficient for a showing of

unconscionability that a party becomes unhappy with the terms of a contract or decides that the

contract was entered into imprudently. *Id*.; *Granati v. Stone St. Capital, Inc.* (*In re Granati*), 307

B.R. 827, 832 (E.D. Va. 2002), *aff'd*, 63 F. App'x 741 (4th Cir. 2003). In such circumstance, the

law is clear that "'courts [are not] at liberty to rewrite the contractual language, even if the plain

language of the contract produces what some may consider a harsh result.'" *Midlothian Enters.,*

*Inc. v. Owners Ins. Co.*, 439 F. Supp. 3d 737, 742 (E.D. Va. 2020) (alteration in original) (quoting

*Trex Co. v. ExxonMobil Oil Corp.*, 234 F. Supp. 2d 572, 575 (E.D. Va. 2002)).

Mrs. Dickson introduced no evidence to sustain a claim of unconscionability. In hindsight,

Mrs. Dickson may wish that she had not accepted James River's offer and entered into the various

agreements. However, she has neither cited any conscience-shocking provisions in any of the three

documents nor any support that a gross disparity in exchanged value existed. Further, Mrs. Dickson

has proffered no evidence of inequity or bad faith by James River when entering into the contracts.

In short, other than the blanket assertions made by counsel in his closing argument, the record is

devoid of evidence sufficient to satisfy the clear and convincing standard to prove

unconscionability.

The Court likewise finds that Mrs. Dickson failed to satisfy the burden of proving by clear

and convincing evidence her apparent claim that she entered into the contracts as a result of duress

and thus they are unenforceable. *See Lee*, 621 F. App'x at 762 (quoting *Pelfrey*, 25 Va. App. at

246). Duress results from the commission of "a wrongful act sufficient to prevent a plaintiff from

exercising his free will, thereby coercing the plaintiff's consent.'" *Id*. (quoting *Goode v. Burke*

*Town Plaza, Inc.*, 246 Va. 407, 411 (1993)). Mrs. Dickson has tendered no evidence showing that

James River committed "a wrongful act" nor has she presented proof that James River prevented

her "from exercising her free will" when deciding whether to sign the various agreements. Mrs.

Dickson's "financial hardship, standing alone, is insufficient to invalidate a contract due to duress

58

under Virginia law." *Id.* Mrs. Dickson declined James River's initial offer to operate the Gas Station. When James River approached her a second time, it offered certain financial assistance, and she accepted the offer. Mrs. Dickson's deposition testimony highlighted her hopeful approach to the endeavor. Mrs. Dickson thought she could successfully operate the Gas Station despite the prior operator being unable to do so based upon information received from customers that the Gas Station was previously a "very good location . . . a very busy location." Dep. at 21. Such testimony is in stark contrast to the requirements necessary for a showing of duress.

Counsel for Mrs. Dickson urged the Court's to exercise its "equitable powers" to find the debt owed to James River to be dischargeable. Tr. at 132. Parties often rely upon Section 105(a) of the Bankruptcy Code as the source of the "equitable powers" of this Court. Section 105(a) permits the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. Section 105(a) may be invoked only in furtherance of the Bankruptcy Code, "not to negate the legal effect of a specific code provision." *S. Bank and Trust Co. v. Alexander* (*In re Alexander*), Adv. Proc. No. 13-07146-SCS, 2014 WL 3511499, at *14 (Bank. E.D. Va. July 16, 2014), *aff'd*, 524 B.R. 82 (E.D. Va. 2014). The Supreme Court has cautioned, "'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code." *Law v. Siegel*, 571 U.S. 415, 421 (2014) (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)). Counsel for Mrs. Dickson fails to enumerate with specificity the basis upon which he believes Section 105(a) should be invoked to provide relief to Mrs. Dickson. Accordingly, the Court declines to further explore this apparent proposed mitigation.

Finally, counsel for Mrs. Dickson asserted that James River has unclean hands and should be estopped from asserting its rights under the Consignment Contract. Tr. at 132. To this end,

counsel argued that Mrs. Dickson informed James River on multiple occasions about insufficient nonfuel sales to cover expenses, to which James River only responded by urging her to continue operations. *Id*. at 129. For additional support, he contended that James River acquiesced to Dickson Convenience's use of the cash fuel proceeds, positing that doing so allowed Dickson Convenience's debt to James River to grow. *See id*. at 129-31. According to Mrs. Dickson's counsel, James River's failure to enforce the provisions of the Consignment Contract caused the debt owed to James River to increase to an amount that Mrs. Dickson will never be able to repay. *See id*. at 131-32.

The doctrine of unclean hands prevents a party from achieving the relief sought "only when there is a close nexus between [that] party's unethical conduct and the transaction on which that party seeks relief." *Rwanda v. Uwimana* (*In re Uwimana*), 274 F.3d 806, 810 (4th Cir. 2001), *abrogated on other grounds by Bullock v. BankChampaign*, 569 U.S. 267 (2013), (citing *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933); *Wetzler v. Cantor*, 202 B.R. 573, 577 (D. Md. 1996)). The purpose of the doctrine is "to prevent a party from using the courts to reap the benefits of wrongdoing." *Id*. at 811. This exact defense was offered by the debtor in *Racetrac Petroleum, Inc. v. Ahmed* (*In re Ahmed*), Adv. Proc. No. 12-01045-BFK, 2012 WL 6093446 (Bankr. E.D. Va. Dec. 7, 2012) (hereinafter, "*In re Ahmed*"). The debtor there argued that Racetrac Petroleum had unclean hands because it advised the debtor's business partner to open a separate bank account to which the debtor did not have access, and as a result Racetrac Petroleum should not recover on its assertion of fiduciary defalcation. *Id*. at *6. Judge Kenney of this Court rejected this defense and concluded that the debtor's failure to monitor the original bank account to which both the debtor and his business partner had access and his subsequent failure to seek

access to the new bank account, not the advice to the business partner to open a new account, caused the loss for which Racetrac Petroleum sought recovery. *Id.* at *6-7.

The Court likewise rejects the application of the unclean hands doctrine in the instant matter. The losses here resulted directly from Dickson Convenience's use of the cash fuel proceeds for its own needs, the decisions to do so being made solely, and repeatedly, by Mrs. Dickson. Further, the decision regarding when and even whether to enforce a contract is the prerogative and business decision of James River. Nothing unethical arises from James River exercising its option to, in essence, not save Mrs. Dickson from herself and her choice to divert James River's cash fuel proceeds for Dickson Convenience's purposes on practically a daily basis. The Court will not permit Mrs. Dickson to shift the responsibility for her own actions to James River based upon the facts before it.

### 4. Mrs. Dickson's Liability for Dickson Convenience's Fiduciary Defalcation

James River seeks the denial of discharge of the debt arising from Dickson Convenience's fiduciary defalcation as to Mrs. Dickson individually by application of the provisions of the Guaranty Agreement. Therefore, in addition to demonstrating that Dickson Convenience committed fiduciary defalcation as relates to James River, James River must also show that Dickson Convenience's actions are attributable to Mrs. Dickson. This Court recently summarized the legal effect of a personal guarantee on the indebtedness of that individual's business.

> The Fourth Circuit Court of Appeals addressed a similar fact pattern in *Airlines Reporting Corp. v. Ellison*, where the debtors owned a travel agency that incurred debts as a result of fiduciary defalcation. Both the Bankruptcy and District Courts concluded that the debtors' personal guarantee of their travel agency's indebtedness to the plaintiff caused them to be personally liable to the plaintiff. On appeal, the Fourth Circuit Court of Appeals held that (1) the debtors personally guaranteed their travel agency's debt to the plaintiff; (2) the travel agency's debt arose from a breach of its fiduciary duty to the plaintiff; (3) the travel agency's breach of fiduciary duty was caused by the debtors' personal conduct; and (4) the debtors' conduct constituted a breach of their fiduciary duty to their travel company. As a

result, the Fourth Circuit determined that the indebtedness under the debtors'
personal guarantee resulted from their defalcation while acting in a fiduciary
capacity and thus was not dischargeable under 11 U.S.C. § 523(a)(4).

*In re Matkins*, 605 B.R. at 108 (discussing *Airlines Reporting Corp. v. Ellison* (*In re Ellison*), 296

F.3d 266, 269-71 (4th Cir. 2002)); *see also Kubota Tractor Corp. v. Strack* (*In re Strack*), 524 F.3d

493, 500-01 (4th Cir. 2008) (finding "[t]he same 'confluence' of factors present" as in *Airlines*

*Reporting* and concluding that the debt owed by the debtor's corporation was not dischargeable in

the debtor's personal bankruptcy under Section 523(a)(4)). The *Airlines Reporting* factors and

analysis are further supported by the proposition that "while an officer of a corporation is in no

way personally liable for corporate torts solely on account of his corporate position, where the

officer actually participates in or otherwise sanctions the tortious acts, personal liability may lie."

*Airlines Reporting*, 296 F.3d at 271 (citing *Bowling v. Ansted Chrysler-Plymouth-Dodge, Inc.*, 188

W.Va. 468, 473 (1992)).

The four factors announced by the Fourth Circuit Court of Appeals in *Airlines Reporting*

unquestionably are met here. It is uncontroverted that "Mrs. Dickson executed a Guaranty

Agreement dated September 21, 2017, wherein [she] guaranteed payment and performance of all

of Dickson Convenience's payments and obligations under the Consignment Contact and Lease

[Agreement]." Partial Stipulation, at para. 8; *see also* Guaranty Agreement, at para. 1. As discussed

in great detail above, James River has proven by a preponderance of the evidence that Dickson

Convenience's debt to it arose from fiduciary defalcation, thus satisfying the second *Airlines*

*Reporting* factor. Dickson Convenience was required to deposit the totality of the cash fuel

proceeds into James River's Account on a daily basis. Despite her subjective awareness of Dickson

Convenience's fiduciary duty to deposit the funds, Mrs. Dickson, on behalf of Dickson

Convenience, consciously disregarded a substantial and unjustifiable risk of violating its fiduciary

duty when she decided to use the funds for Dickson Convenience's expenses. Regarding the third factor, Mrs. Dickson does not dispute her personal conduct in this case as it relates to Dickson's Convenience's actions and its resulting breach of fiduciary duty to James River. She admitted that she alone made the decisions on behalf of Dickson Convenience to use the cash fuel proceeds instead of depositing the total amounts of those proceeds into James River's Account.

With respect to the final factor, as the sole officer and managing member of Dickson Convenience, Mrs. Dickson was obligated to discharge her fiduciary duties to Dickson Convenience. Because Dickson Convenience was a North Carolina member-managed limited liability company, Mrs. Dickson was charged by statute with exercising her duties in a prudent fashion and in good faith. *See* N.C. Gen. Stat. § 57D-3-21(b) (2020) ("Each manager shall discharge that person's duties (i) in good faith, (ii) with the care an ordinary prudent person in a like position would exercise under similar circumstances, and (iii) subject to the operating agreement, in a manner the manager believes to be in the best interests of the LLC."). Dickson Convenience did not have an operating agreement; therefore, Mrs. Dickson's statutory obligations as a member of the limited liability company remained unchanged.[62] The facts here plainly demonstrate that Mrs. Dickson did not execute her duties with the requisite good faith or with the care and prudence of an ordinary person in similar circumstances. As a fiduciary to Dickson Convenience, the sole decision maker for the company, and Dickson Convenience's signatory on the Consignment Contract, she was acutely aware of the duty to deposit the cash fuel proceeds on a daily basis. Her actions directly caused Dickson Convenience to violate its fiduciary duty to James River. The Court cannot conclude that Mrs. Dickson's conduct reflects good faith or the

---

[62] *See supra* note 10.

care of an ordinary prudent person. Instead, the Court must find that Mrs. Dickson breached her fiduciary duty to Dickson Convenience.

Taking the four *Airlines Reporting* factors together, the Court concludes that Mrs. Dickson is liable for Dickson Convenience's fiduciary defalcation by reason of the Guaranty Agreement because she was acting in a fiduciary capacity to Dickson Convenience. Accordingly, the Court concludes as a matter of law that the debt owed to James River should be determined nondischargeable under 11 U.S.C. § 523(a)(4) in Mrs. Dickson's bankruptcy case.[63]

### C.  Amount of Nondischargeable Debt

To determine the amount of debt that is nondischargeable in Mrs. Dickson's bankruptcy case, the Court must first calculate the amount of James River's cash fuel proceeds that Dickson Convenience failed to deposit pursuant to the Consignment Contract. The base amount of debt will permit the Court to then calculate the applicable late fees as set forth in the Consignment Contract and attorney's fees pursuant to the Guaranty Agreement. *See* Consignment Contract, at paras. C(5)(a), E(12); Guaranty Agreement, at para. 1.

At trial, James River reduced the amount of cash fuel proceeds it asserted Dickson Convenience failed to deposit from $171,575.11 as set forth in the Complaint to $159,439.31 to account for network processing fees that were the responsibility of James River. Complaint, at prayer; Tr. at 94-95; Account Reconciliation, at 3. The Court has thoroughly reviewed James River's Account Reconciliation and supporting documentation, all of which was uncontested by Mrs. Dickson. The Court finds as a finding of fact that Dickson Convenience sold a gross dollar

---

[63] In light of the conclusion that the debt owed to James River is nondischargeable pursuant to Section 523(a)(4), the Court need not determine whether the debt would also be found to be nondischargeable under the remaining counts set forth in the Complaint.

amount of James River's fuel of $1,558,018.32. Account Reconciliation, at 1, 5-16.[64] The Court

further finds that James River received credit card remittances equaling $1,261,452.05. *Id*. at 1,

17-31. During its operation of the Gas Station, Dickson Convenience made cash deposits into

James River's Account totaling $124,991.16. *Id*. at 1, 32; *see* Pl. Ex. 5, James River Petroleum,

Inc., BB&T Statements dated November 2017 through May 2019. Ms. Hawthorne testified that

James River was obligated to pay $12,135.80 for network processing fees, such that the total

amount owed by Dickson Convenience should be reduced by that amount. Tr. at 94-95.

Accordingly, the Court concludes that the base amount of the debt owed to James River,

representing total cash fuel proceeds that Dickson Convenience, through Mrs. Dickson's actions,

failed to deposit into James River's Account, equals $159,439.31. The Court finds that this amount

should be determined to be nondischargeable for the reasons stated above.

Pursuant to Paragraph C(5)(a) of the Consignment Contract, James River is also entitled to

late fees equal to ten percent of the total dollar amount of fuel sold for which the cash proceeds

were not deposited into James River's Account. Therefore, because the Court has determined that

Dickson Convenience failed to deposit $159,439.31 in cash fuel proceeds, the Court concludes

---

[64] The supporting documentation contained within the Account Reconciliation exhibit indicates that Dickson Convenience sold $2,588.48 of James River's fuel products both on May 3, 2018, and May 4, 2018. Account Reconciliation, at 10. The documentation further indicates that Dickson Convenience sold the same amount of 87, 89, and 93 octane fuels and diesel fuel each day. *Id*. It does not appear from the evidence before the Court that this represents a double-counting error by James River. The represented dollar amount of fuel products sold on the specified dates falls within the typical range of fuel products sold by Dickson Convenience. *See supra* note 34 (noting an approximate average daily gross dollar amount of fuel products sold of $3,000.00). As Mrs. Dickson has not contested the amounts contained within James River's records, the Court will accept the amount as stated, even if it is perhaps improbable that the same amounts of fuel were sold on both days.

that late fees of $15,943.93 should be added in the amount determined to be nondischargeable in

Mrs. Dickson's bankruptcy case.[65]

James River also requests the Court award attorney's fees. The Complaint fails to specify

the provision(s) of the document(s) under which reimbursement is sought. During his closing

argument, counsel for James River referenced the provision for attorney's fees contained in the

Guaranty Agreement, which provides for "reasonable attorneys' fees in the amount of 33% of the

amount owed, as a result of [James River]'s efforts in collecting any amount due under this

Guaranty Agreement." Guaranty Agreement, at para. 1; *see* Tr. at 114, 125. Counsel for Mrs.

Dickson did not contest the applicability of this provision. Further, as the mechanism for finding

Mrs. Dickson liable for Dickson Convenience's fiduciary defalcation is the Guaranty Agreement,

the Court finds that the attorney fee provision from that agreement governs. This provision also

satisfies the requirement that an enforceable contract exist for a prevailing party to recover

attorney's fees. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257 (1975)

(holding that, absent a statute or an enforceable contract, litigants in the United States generally

bear their own attorney's fees); *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 92 (1999) (citing

*Gilmore v. Basic Indus., Inc.*, 233 Va. 485, 490 (1987)) (holding the same for litigants in the

Commonwealth of Virginia).

---

[65] The Court's calculation of the amount of late fees comports with that by James River, both as set forth in the Complaint (*see* Complaint, at para. 19, prayer) and in the closing argument delivered by counsel for James River (*see* Tr. at 125). The Consignment Contract could be interpreted as providing for a different calculation. *See* Consignment Contract, at para. C(5)(a) (providing for "a late charge of 10% of the total [petroleum] Product Sales for each day (and any part thereof) that elapses without deposit of the Shortfall until such time as [James River] receives a deposit for the Shortfall plus the late charges into its designated bank account"). The Court defers to James River's interpretation of the Consignment Contract, as James River is the presumed drafter of the document.

This Court has previously concluded, based upon Virginia law (applicable here by virtue of the choice of law provision), that "a[n attorney] fee stipulated by contract is *prima facie* reasonable and should be paid unless excessive or unreasonable." *Elrod v. Bowden* (*In re Bowden*), 326 B.R. 62, 99 (Bankr. E.D. Va. 2005) (citing *First Am. Bank v. MacDonald*, 30 Va. Cir. 299, 1993 WL 946014, at *2 (Va. Cir. Ct. 1993)). Accordingly, the defendant has the burden of proving either "'that the plaintiff did not incur the amount expressed in the agreement or that the fee agreed upon was excessive or unreasonable.'" *Id.* (quoting *MacDonald*, 1993 WL 946014, at *2). In the absence of such proof, the plaintiff's attorney's fees are chargeable against the defendant and constitute nondischargeable debt. *See id.* at 98-99 (discussing *Wegmans Food Mkts., Inc. v. Lutgen* (*In re Lutgen*), No. 98-CV-0764E, 1999 WL 222605, at *1-3 (W.D.N.Y. Apr. 5, 1999)).

Mrs. Dickson did not contest, either through evidence or by argument of counsel, James River's request for attorney's fees in the amount of thirty-three percent of the amount sought pursuant to the Guaranty Agreement. *See* Tr. at 128-33. The total cash fuel proceeds not deposited into James River's Account equals $159,439.31.[66] Therefore, the Court finds that James River is entitled under the Guaranty Agreement provision to attorney's fees equaling $53,146.44, which amount the Court finds should also be determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

Last, the Complaint requests the assessment of pre- and post-judgment interest at the federal judgment rate. Complaint, at prayer. "An award of prejudgment interest is compensatory in nature 'and is designed to compensate the plaintiff who has been without deserved relief for an

---

[66] During his closing argument, counsel for James River represented that the attorney's fees should be calculated based upon the total cash fuel proceeds that were not deposited into James River's Account; he did not include in his calculation the ten percent late fees. Tr. at 125.

extended period of time." *Alfred C. Cordon, P.C. v. Urban Telecomms. Corp.*, No. 90-2464, 1991

WL 161501, at *3 (4th Cir. Aug. 23, 1991) (quoting *Gill v. Rollins Protective Servs. Co.*, 836 F.2d

194, 198 (4th Cir. 1987)). Under Virginia law, while a plaintiff may seek prejudgment interest,

such awards are made at the discretion of the trial court. *McLean v. Ray*, 488 F. App'x 677, 683

(4th Cir. 2012) (citing *Upper Occoquan Sewage Auth. v. Blake Constr. Co.*, 275 Va. 41, 63-64

(2008) (citing Va. Code Ann. § 8.01-382)). The Court must "weigh the equities in a particular case

to determine whether an award of prejudgment interest is appropriate." *Moore Bros. Co. v. Brown

& Root, Inc.*, 207 F.3d 717, 727 (4th Cir. 2000) (citing *McDevitt & St. Co. v. Marriott Corp.*, 754

F. Supp. 513, 515 (E.D. Va. 1991)). Those equities include "the desire to make the prevailing party

whole, including compensation for its lost ability to use the money to which it was rightfully

entitled, [versus] the losing party's right to litigate a bona fide legal dispute." *Tech. & Supply

Mgmt., LLC v. Johnson Controls Bldg. Automation Sys., LLC*, Civ. Action No. 1:16-cv-303, 2017

WL 3219281, at *20 (E.D. Va. July 28, 2017) (citing *Wells Fargo Equip. Fin., Inc. v State Farm

Fire & Cas. Co*., 823 F. Supp. 2d 364, 366 (E.D. Va. 2011)).

Balancing the equities presented here, the Court declines to exercise its discretion to award

James River prejudgment interest. First, James River provided no justification to support its

request for prejudgment interest, including but not limited to why such award is appropriate here

and the basis for calculating an award of prejudgment interest. *See Bickley v. Gregory*, Civ. Action

No. 2:16cv131, 2016 WL 6306148, at *11 (E.D. Va. Oct. 7, 2016) (recommending denial of award

of prejudgment interest where the plaintiff failed to offer an explanation as to the appropriateness

of such award), *report and recommendation adopted*, 2016 WL 6398804, at *1 (E.D. Va. Oct. 26,

2016). In fact, during his closing argument, counsel for James River specifically requested

postjudgment, but not prejudgment, interest. Tr. at 126. Additionally, the litigation in this matter

has not been overly protracted. Dickson Convenience ended operations in March 2019, and the trial on this matter was held approximately ten months later. Further, neither the Consignment Contract nor the Guaranty Agreement makes specific provision for interest of any type. *Urban Telecomms. Corp.*, 1991 WL 161501, at *3 (affirming denial of prejudgment interest where agreement did not provide for interest). Finally, the Consignment Contract provides for late fees, which this Court finds adequately compensates James River for its loss of use of funds. *See Johnson v. Washington*, Civil Action No. 2:07cv204, 2008 WL 11432184, at *2 (E.D. Va. May 2, 2008) ("The award of the late fee served the same purpose as an award of prejudgment interest would serve; namely, to compensate [the counterclaim plaintiff] for his loss for not receiving the monthly payment when it was due. The court, therefore, finds that . . . it would also be inequitable to award [the counterclaim plaintiff] prejudgment interest."). The Court finds that the determined nondischargeable debt here, which includes an award of late fees, serves to make James River whole and that the application of prejudgment interest is not necessary to accomplish that goal. While Mrs. Dickson has not challenged James River's request for prejudgment interest, such failure is not determinative of this issue when such decision rests in the Court's discretion. For the reasons stated, the Court finds that awarding prejudgment interest in this matter is not appropriate

In contrast to prejudgment interest, "the application of post-judgment interest for all money judgments is mandatory." *Upper Occoquan Sewage Auth.*, 275 Va. at 63 (citing Va. Code Ann. § 8.01-382; *Dairyland Ins. Co. v. Douthat*, 248 Va. 627, 631 (1994)). "[P]ostjudgment interest is not an element of damages, but is a statutory award for delay in the payment of money actually due." *Dairyland Ins.*, 248 Va. at 632 (citing *Nationwide Mut. Ins. Co. v. Finley*, 215 Va. 700, 702 (1975)). Accordingly, the Court finds that postjudgment interest shall accrue at the federal

69

judgment rate set forth in 28 U.S.C. § 1961 from the date of entry of the separate Order to be entered consistent with the findings herein.

## IV. CONCLUSION

James River has proven by preponderance of the evidence, for reasons stated herein, that Dickson Convenience committed fiduciary defalcation under 11 U.S.C. § 523(a)(4). For the reasons stated herein, by operation of the Guaranty Agreement, Mrs. Dickson is liable for the debt related to this action, and the Court finds that Mrs. Dickson owes James River nondischargeable debt totaling $228,529.68 plus postjudgment interest as set forth above.

The Court will enter a separate Order consistent with the findings and conclusions in this Memorandum Opinion.

The Clerk is directed to transmit a copy of this Memorandum Opinion to Christian K. Vogel, counsel for James River Petroleum, Inc.; and Kenneth A. Moreno, counsel for Nikole Ann Dickson.

Entered at Norfolk in the Eastern District of Virginia on this 29th day of September, 2020.


Sep 29 2020

/s/ Stephen C St-John
STEPHEN C. ST. JOHN
United States Bankruptcy Judge


Entered On Docket: Sep 29, 2020